**In the Matter of William Clyde SANDS, Jr., Debtor.**

William Clyde SANDS, Jr., Plaintiff,

v.

**UNITED STUDENT AID FUNDS, INC., as Guarantor for Student Loan Marketing Association, Defendant (Three Cases).**

William Clyde SANDS, Jr., Plaintiff,

v.

**INB NATIONAL BANK, Defendant.**

William Clyde SANDS, Jr., Plaintiff,

v.

**INDIANA NATIONAL BANK, Defendant.**

William Clyde SANDS, Jr., Plaintiff,

v.

**ANDREWS UNIVERSITY, Defendant.**

**Bankruptcy No. GK 92–86947.**
**Adv. Nos. 93–8053 to 93–8058 and 93–8071.**

United States Bankruptcy Court,
W.D. Michigan.

March 31, 1994.

William Clyde Sands, Jr., in pro. per., for plaintiff/debtor.

Deborah L. Gray–Olker, Kalamazoo, MI, for defendant United Student Aid Funds, Inc.

John T. Burhans, St. Joseph, MI, for defendant Andrews University.

*OPINION REGARDING HARDSHIP DISCHARGEABILITY OF STUDENT LOANS*

JAMES D. GREGG, Bankruptcy Judge.

## I. ISSUE

The issue before the court is whether the Debtor's various student loan obligations are dischargeable because repayment would constitute an "undue hardship". The court has decided to render a written opinion because, to date, there are no reported decisions discussing the issue in this district.

## II. JURISDICTION

This court has jurisdiction over these consolidated adversary proceedings pursuant to 28 U.S.C. § 1334. These are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I), and this court has authority to enter a final judgment under 28 U.S.C. § 157(b)(1). The following constitutes the court's findings of fact and conclusions of law. FED.R.BANKR.P. 7052.

## III. FACTS

On December 28, 1992, William Clyde Sands, Jr. (the "Debtor") filed for relief under chapter 7 of the Bankruptcy Code.[1] This court signed the Debtor's discharge order in the chapter 7 case on April 1, 1993. Prior to the closing of his chapter 7 case, the Debtor filed seven adversary proceedings against United Student Aid Funds, Inc. ("USAF") and Andrews University ("Andrews") seek-

---

1. The "Bankruptcy Code", as amended, is set forth at 11 U.S.C. §§ 101–1330.

ing discharge of numerous student loans. On February 8, 1993, the Debtor filed six adversary complaints against USAF[2] seeking discharge of his student loans on the basis of § 523(a)(8)(A) and (B).[3] On February 16, 1993, the Debtor filed an adversary complaint against Andrews seeking discharge of a student loan pursuant to § 523(a)(8)(A) and (B).

On June 11, 1993, this court ordered consolidation of the seven adversary proceedings. Trial was held in Grand Rapids, Michigan on November 9, 1993. At the beginning of trial, the parties entered several stipulations on the record. First, the parties agreed not to litigate the seven-year rule contained at § 523(a)(8)(A)[4] and to focus on the issue of undue hardship under § 523(a)(8)(B). Trial Transcript, November 9, 1993, at 5–6 [hereinafter "Transcript"]. Second, the Debtor and USAF submitted a written stipulation agreeing that the Debtor had incurred $65,097.55[5] in student loans indebtedness between January 1, 1986 and May 30, 1990. Transcript at 6–7; Stipulation between USAF and Debtor, bench filed 11/9/93. Finally, the Debtor and Defendant Andrews stipulated that the Debtor owed Andrews $3,390.00 on the date of filing of the bankruptcy petition. Transcript at 170–171. After a day-long trial at which two witnesses testified and eight exhibits were offered into evidence, the court took the matter under advisement.

## IV. LEGAL ANALYSIS

### A. Undue Hardship Standards

The Bankruptcy Code excepts student loans from a debtor's discharge unless the loans first came due more than seven years prior to the filing of bankruptcy or failure to discharge would constitute an undue hardship. 11 U.S.C. § 523(a)(8). The only issue before this court is whether the Debtor satisfies the standards for a hardship discharge under 11 U.S.C. § 523(a)(8)(B) of the Bankruptcy Code.

Section 523(a)(8)(B) provides as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt— ...

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—
...

(B) excepting such debt from discharge under this paragraph will impose

---

**2.** At the first pretrial conference, the parties stipulated that United Student Aid Funds, Inc. is the proper defendant in all adversary proceedings against Indiana National Bank, a/k/a INB. Consolidated First Pretrial Order, June 11, 1993, at 5.

**3.** The Debtor sought discharge under § 523(a)(8)(A) for the loans at issue in adversary proceeding 93–8053. For adversary proceedings 93–8054, 93–8055, and 93–8058, the Debtor requested discharge of the loans under § 523(a)(8)(A) and § 523(a)(8)(B). Finally, for adversary proceedings 93–8056 and 93–8057, the Debtor sought discharge solely on the ground of undue hardship under § 523(a)(8)(B).

**4.** "(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt— ...

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; ...."
11 U.S.C. § 523(a)(8)(A).

**5.** The transcript contains a typographical error, stating the total indebtedness as $65,097.35 instead of $65,097.55, as provided for in the Stipulation between USAF and the Debtor. The court notes that it is unable to arrive at the stipulated amount of $65,097.55, given the original and adjusted loan figures, as stated in the Stipulation. The *original* loan balance, according to paragraph 1 of the Stipulation, was $68,097.08. Paragraph 2 states that the parties agreed to withdraw a loan in the amount of $3,000.14. Thus, the *adjusted* loan balance *should* be $65,-096.94 *not* $65,097.55, as stated in paragraph 3 of the Stipulation.

an undue hardship on the debtor and the debtor's dependents; . . . .

11 U.S.C. § 523(a)(8)(B). The difficulty, however, lies in defining what constitutes undue hardship because neither the Bankruptcy Code nor the legislative history to § 523 provides a definition of the term. This statutory void has spawned abundant case law establishing various standards for dischargeability of student loans on the basis of undue hardship.

### 1. Commission's Analysis/Toukkala and Skidmore

A number of courts have looked to the 1973 Report of the Commission on the Bankruptcy Laws of the United States for guidance in defining undue hardship. See Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews ), 661 F.2d 702, 704 (8th Cir.1981); Skidmore v. Northern Michigan Univ. (In re Skidmore ), No. M88–308 CA2, 1989 WL 438755 (W.D.Mich. September 11, 1989); Toukkala v. Iron River Nat'l Bank (In the Matter of Toukkala ), No. K79–110 CA8 (W.D.Mich. May 2, 1983); Carter v. Kent State University (In re Carter ), 29 B.R. 228, 231–32 (Bankr.N.D.Ohio 1983); Wegfehrt v. Ohio Student Loan Comm'n (In re Wegfehrt ), 10 B.R. 826, 830 (Bankr. N.D.Ohio 1981); Georgia Higher Educ. Assistance Corp. (In re Bell ), 5 B.R. 461, 463 (Bankr.N.D.Ga.1980). . Concerned with the increase in bankruptcy filings by debtors primarily seeking discharge of educational debts, the Commission Report recommended "limited dischargeability" of student loan indebtedness. While the Commission Report did not explicitly define undue hardship, it did enumerate several factors for courts to examine in making an undue hardship determination.

In order to determine whether nondischargeability of the debt will impose an "undue hardship" on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capability, as well as to pay the educational debt.

COMMUNICATION FROM THE EXECUTIVE DIRECTOR, COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES. REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. DOC. No. 93–137, Part II, 93d Cong., 1st Sess. 140 n. 17 (1973) [hereinafter "Commission Report"]. Some courts, including the United States District Court for the Western District of Michigan, have utilized the language in the Commission Report and transformed it into the following four-part test:

[I]n determining undue hardship the court must consider: (1) if the debtor has any accumulated wealth or any reasonable prospects of acquiring any, (2) what the debtor's chances are of obtaining and retaining steady employment and what income can be expected, (3) the amount the debtor will need to maintain a minimal standard of living, and (4) if there would be anything left from the estimated income to allow the bankrupt to make some payments on the loan without reducing what is needed to live on.

Connecticut Student Loan Foundation, Inc. v. Bagley (In re Bagley ), 4 B.R. 248, 250–51 (Bankr.D.Ariz.1980); accord Skidmore v. Northern Michigan Univ. (In re Skidmore ), No. M88–308 CA2, slip op. at 6–7, 1989 WL 438755 (W.D.Mich. September 11, 1989); Toukkala v. Iron River Nat'l Bank (In re Toukkala ), No. K79–110 CA8, slip op. at 6 (W.D.Mich. May 2, 1983).

### 2. The Johnson Test

Although its analysis began with an examination of the Commission Report, the court in Pennsylvania Higher Educ. Assistance Agency v. Johnson (In re Johnson ), 5 Bankr.Ct. Dec. 532 (Bankr.E.D.Pa.1979) elaborated on the language in that report, creating a complex three-part test for decid-

ing whether to discharge a debtor's student loans on the basis of undue hardship.[6]

One of the earliest decisions interpreting the meaning of "undue hardship", *Johnson* has been followed or cited approvingly by a number of other courts.[7] *See Phillips v. Great Lakes Higher Educ. Corp. (In re Phillips)*, 161 B.R. 945 (Bankr.N.D.Ohio 1993); *Bakkum v. Great Lakes Higher Educ. Corp. (In re Bakkum)*, 139 B.R. 680 (Bankr. N.D.Ohio 1992); *Conner v. Illinois State Scholarship Comm'n (In re Conner)*, 89 B.R. 744 (Bankr.N.D.Ill.1988); *United States v. Conard (In re Conard)*, 6 B.R. 151 (Bankr. W.D.Ky.1980).

The *Johnson* court began its analysis with a mechanical test in which it examined the debtor's financial resources to determine whether the debtor could repay his student loans (over the longest period allowed for repayment) and still maintain himself and his dependents at a subsistence standard of living. *Pennsylvania Higher Educ. Assistance Agency v. Johnson (In re Johnson)*, 5 Bankr.Ct. Dec. at 544. If the debtor had sufficient financial resources to repay his student loans, the court would not discharge those loans. However, if repayment of the loans meant that the debtor could not maintain even a poverty-level standard of living,

then the court progressed to the good faith test.

In determining a debtor's good faith, the court required a determination of whether the debtor had acted either negligently or irresponsibly in minimizing expenses, maximizing resources, or securing employment. If the court found that the debtor had acted responsibly, then it would grant the debtor a discharge of the student loan. However, if the court determined that the debtor had acted negligently or irresponsibly, then it looked at whether the absence of such negligence or irresponsibility on the part of the debtor would have changed the answer to the mechanical test, i.e., *could* the debtor have repaid his loans and still maintained a subsistence standard of living. By failing the good faith test, the debtor created a presumption of no discharge, rebuttable by a negative answer to the policy test. *Id.*

The policy test then required the court to examine the policies underlying Congress's decision to except student loans from discharge and to determine whether discharge of the loans in the case before the court contravened those policies. In making this determination, the court calculated the total amount of student loans owed as well as the ratio of the debtor's student loans to other

---

**6.** The court in *Pennsylvania Higher Educ. Assistance Agency v. Johnson (In re Johnson)*, 5 Bankr.Ct.Dec. 532 (Bankr.E.D.Pa.1979) interpreted the undue hardship language in § 439A of the Higher Education Act of 1965, as amended. Section 439A provided, in relevant part, as follows:

"Sec. 439A. (a) A debt which is a loan, insured or guaranteed under the authority of this part may be released by a discharge in bankruptcy under the Bankruptcy Act only if such discharge is granted after the five year period (exclusive of any applicable suspension of the repayment period) beginning on the date of the commencement of the repayment period of such loan, *except that prior to the expiration of that five-year period, such loan may be released only if the court in which the proceeding is pending determines that payment from future income or other wealth will impose an undue hardship on the debtor or his dependents.*"

*Pennsylvania Higher Educ. Assistance Agency v. Johnson (In re Johnson)*, 5 Bankr.Ct.Dec. at 532 (emphasis added). The *Johnson* case fell between the repeal of § 439A and the effective date of the Bankruptcy Reform Act of 1978, which included an exception to the discharge for stu-

dent loans that was very similar to that included in § 439A. Those courts using the *Johnson* analysis have taken the court's three-part test developed under § 439A and simply applied it to the exception to discharge cases arising under § 523(a)(8)(B) of the Bankruptcy Code.

**7.** Apparently, the *Johnson* court did not intend that in every case a court should engage in the mechanical, good faith, and policy tests. If, for example, the debtor did not satisfy the mechanical test, the court would not discharge the student loan. Yet, a few courts have interpreted *Johnson* to require an examination of all three portions of the court's test. *See Bakkum v. Great Lakes Higher Educ. Corp. (In re Bakkum)*, 139 B.R. 680, 683 (Bankr.N.D.Ohio 1992) ("This Court believes the combination of all three tests should be used in determining whether a student loan should or should not be discharged on undue hardship grounds."); *Conner v. Illinois State Scholarship Comm'n (In re Conner)*, 89 B.R. 744, 747 (Bankr.N.D.Ill.1988) ("This Court believes that the better approach is to use all three tests in combination in determining whether a student loan should or should not be discharged on undue hardship grounds.").

indebtedness. The court also examined the debtor's employment prospects. Essentially, the court asked two questions: (1) did the debtor file bankruptcy primarily to discharge his student loans; and (2) did the debtor benefit financially from the education financed, in part, by the student loans? If the court answered both questions in the negative, then the court would discharge the student loans. However, if the court answered yes to either or both questions, then it would not discharge those loans. *Id.*

### 3. The Bryant Test

In *Bryant v. Pennsylvania Higher Educ. Assistance Agency (In re Bryant)*, 72 B.R. 913 (Bankr.E.D.Pa.1987), Judge Scholl declined to follow *Johnson's* analysis, even though *Johnson* had been decided eight years earlier in the same bankruptcy court. The court in *Bryant* found the *Johnson* analysis overly complicated and instead strove for an objective test for undue hardship. *Bryant v. Pennsylvania Higher Educ. Assistance Agency (In re Bryant)*, 72 B.R. at 915 n. 2. The *Bryant* court held that it would discharge a debtor's student loans (1) if the debtor's income did not substantially exceed federal poverty guidelines or (2) if the debtor showed "unique" or "extraordinary" circumstances making repayment of the loans unlikely even though the debtor's income substantially exceeded federal poverty guidelines. *Id.* at 914. *See also Reilly v. United Student Aid Funds, Inc. (In re Reilly)*, 118 B.R. 38 (Bankr.D.Md.1990) (discussion of objective *Bryant* test).

Despite *Bryant*'s criticism of *Johnson,* some courts still consider the undue hardship test in *Johnson* and the three-part test articulated by the Second Circuit in *Brunner v. New York State Higher Educ. Servs. Corp.,* 831 F.2d 395 (2d Cir.1987) to be the two most commonly used standards for determining undue hardship discharges of student loans.

*See Phillips v. Great Lakes Higher Educ. Corp. (In re Phillips )*, 161 B.R. at 947 ("The two tests most widely applied by courts in determining whether an educational loan constitutes an 'undue hardship' are those articulated in *Brunner v. New York State Higher Educ. Services Corp.* and *Pennsylvania Higher Educ. Assistance Agency v. Johnson (In re Johnson )*."); *see also In the Matter of Roberson,* 999 F.2d 1132, 1135 (7th Cir.1993) (Court adopts *Brunner* test, declining to follow *Johnson,* as did the bankruptcy and district courts).[8]

### 4. The Brunner Test

As did *Johnson, Brunner* established a three-part test for determining dischargeability of student loans. First, the *Brunner* court examined the debtor's expenses and income to determine if repayment of the student loans would preclude the debtor from maintaining a minimal standard of living. *Brunner,* 831 F.2d at 396. Second, the court looked for additional, exceptional circumstances that suggest that the debtor's current inability to repay his loans would continue "for a significant portion of the repayment period. . . ." *Id.* Finally, the court inquired into the debtor's good faith efforts to repay his student loans. *Id.* Finding neither exceptional circumstances suggesting a long-term inability to repay her student loans nor a good-faith effort to repay those loans, the *Brunner* court refused to discharge the debtor's student loans. *Id.* at 396–97.

### 5. Standard for "Hardship" Determination

■ Of the four standards articulated above for undue hardship discharges of student loans—the Commission/Toukkala and Skidmore test, the three-part *Johnson* inquiry, the objective *Bryant* standard, and the three-part *Brunner* test—this court adopts

---

8. At least one court views the *Johnson* and *Brunner* tests as interchangeable. *See Woyame v. Career Educ. & Mgt. (In re Woyame )*, 161 B.R. 198, 201 (Bankr.N.D.Ohio 1993) (citing *Brunner* as affirming the *Johnson* decision). In addition, while not finding the two tests to be interchangeable *per se,* the district court in *Healey v. Massachusetts Higher Educ. (In re Healey )*, 161 B.R. 389, 393 (E.D.Mich.1993) stated that the *Brunner*

test incorporated all three portions of the *Johnson* analysis. This court disagrees with both the *Woyame* and the *Healey* courts on this point. First, while similar, the *Johnson* and *Brunner* tests are not identical. Second, the *Brunner* test does not require the policy analysis in part three of the *Johnson* test and, thus, does not incorporate all elements of the *Johnson* analysis.

the *Brunner* test for the following reasons. First, *Brunner* condenses the four-part Commission standard into a straightforward, three-part inquiry. The prior unpublished opinions of the United States District Court for the Western District of Michigan in *Toukkala* and *Skidmore* incorporate the factors identified in the Commission Report. A comparison of the *Toukkala/Skidmore* factors with the *Brunner* elements demonstrates the similarity in the analyses. Factors one, three, and four of the *Toukkala/Skidmore* discussion are the same as element one of the *Brunner* test: Can the debtor make payments towards his student loans given his current savings and income versus his current expenses? Factor two of the *Toukkala/Skidmore* discussion corresponds to element two of the *Brunner* test: Do exceptional circumstances exist which preclude the debtor from obtaining and retaining steady employment for a long period into the future? [9] Thus, while *Toukkala* and *Skidmore* articulate the factors for dischargeability differently than does the *Brunner* test, the factors examined essentially are identical.

Second, this court rejects the *Johnson* analysis because it is hideously complicated. *See Bryant v. Pennsylvania Higher Educ. Assistance Agency (In re Bryant)*, 72 B.R. at 915 n. 2. In addition, *Johnson*'s policy test requires a determination of whether the debtor benefitted from his education. Determining future employability is difficult enough without also adding to the analysis a very subjective inquiry regarding the value a debtor obtained by virtue of his education. Moreover, if a debtor makes an irrational career choice and finances that choice with government-guaranteed loans, the debtor, not the government, should be ultimately accountable.[10] "[T]he government does not guarantee the student's future financial success. If the leveraged investment of an education does not generate the return the bor-

rower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow." *In re Roberson*, 999 F.2d at 1137.

Finally, this court rejects the *Bryant* objective test as inadequate. The *Bryant* test takes a snapshot of the debtor's financial condition. A debtor at or below the poverty line will receive a discharge of his student loans unless the *creditor* provides evidence of "unique" or "extraordinary" circumstances warranting a finding of nondischargeability. Thus, *Bryant* does not sufficiently consider potential changes to a debtor's current financial condition that would make repayment of student loans more likely in the future. Overall, it seems to delete the "undue" from "undue hardship" in the statutory language. Thus, *Bryant* fails to consider factors that this court deems relevant to the discharge analysis.

### B. *The Brunner Analysis Applied*

█ There are three parts to the *Brunner* analysis. The Debtor bears the burden of proof on all three elements. *See Healey v. Massachusetts Higher Educ. (In re Healey)*, 161 B.R. 389, 393 (E.D.Mich.1993) (Once the creditor establishes the existence of the student loan debt and that the seven-year rule does not apply, the debtor bears the burden of showing by a preponderance of the evidence that repayment constitutes an undue hardship). If the Debtor fails to show by a preponderance of the evidence that he satisfies all three parts of the *Brunner* analysis, then he does not satisfy the undue hardship standard of § 523(a)(8)(B) and this court may not discharge the Debtor's student loans.

### 1. *Current Financial Condition*

█ The court must evaluate the Debtor's current financial condition to decide whether the Debtor has any excess money in his budget to repay his student loans. The court

---

**9.** While neither *Toukkala* nor *Skidmore* explicitly addresses a debtor's good faith efforts to repay his student loans prior to filing for bankruptcy, this court believes this factor is relevant to a discharge determination and does not violate the purpose or spirit of the *Toukkala/Skidmore* test.

**10.** The system itself is somewhat crazy. Why should a student even be permitted to borrow tens of thousands of dollars to pursue a degree with very limited marketability? If banks were lending their *own* money rather than government-guaranteed dollars, would such questionable loans be made?

must examine the Debtor's expenses as well as all of his available income. In addition, the court must evaluate whether the Debtor has minimized his expenses and maximized his financial resources; this requires a review of the reasonableness of the expenses budgeted by the Debtor and an inquiry into the Debtor's efforts, or lack thereof, to secure employment. *See Healey v. Massachusetts Higher Educ. (In re Healey )*, 161 B.R. at 394 (citation omitted) ("Implicit within this inquiry [into minimal standard of living] is the requirement that the debtor demonstrate that she is actively minimizing her current household living expenses and maximizing personal and professional resources.").

■ At the time of trial, the Debtor was receiving $448 per month from the Social Security Administration as Supplemental Security Income ("SSI"), which amounts to $5376 in SSI income per year. Plaintiff's Exh. 7 at 7.[11] Unfortunately, the Debtor's remaining testimony and evidence concerning his family's income provided no other *definite* figures for calculating his family's income in 1993. As a result, this court has calculated a range of family income, with a minimum and maximum annual income for 1993.

In 1993 the Debtor's wife received $81 per week in unemployment benefits. Transcript at 157. The Debtor failed to present evidence *prior* to the closing of proofs as to when his wife's benefits began or would terminate. *See* Transcript at 209–210 (In his closing argument, the Debtor gave an approximate date when his wife began collecting unemployment compensation.) Nonetheless, unemployment compensation typically expires after 26 weeks in Michigan.[12] 1B Unemployment Ins. Rep. (CCH) ¶ 3001 (Aug. 24, 1993). The Emergency Unemployment Compensation Program extended that 26–week period another 7 weeks in Michigan

(for a total of 33 weeks) for certain long-term unemployed workers. *Clinton OKs Extension of Jobless Benefits*, Los Angeles Times, Nov. 25, 1993, at A29; *Federal Jobless Benefits Extended; MESC to Mail EUC Applications*, PR Newswire, Nov. 29, 1993, *available in* LEXIS, Nexis News Library, WIRES File. Thus, the unemployment income of the Debtor's wife added between $2,106 (26 weeks) and $2,673 (33 weeks) to the Debtor's family income for 1993. In addition to this unemployment income, the Debtor's wife earned "less than $2,000" from her part-time work with World Book. Transcript at 157. Thus, in 1993, the Debtor's wife contributed between $4,106 and $4,673 to the Debtor's family income.

The Debtor also earned income as a computer consultant in 1993. Although the Debtor did not provide exact figures, he stated that he worked no more than 50 hours at a wage of $8.50 per hour, for a maximum of $425. Transcript at 130–31. The Debtor does not anticipate receiving any inheritance because his mother advanced him $10,000 in the late 1970's when he needed funds for a failing business venture. Transcript at 164–65.

Finally, the Debtor's twenty-one-year-old son, who resides with his parents, pays approximately $65 to $70 per month to the Debtor as board. Transcript at 82. While the record is not clear on this point, the court considers the Debtor's son to be self-supporting. Thus, the court concludes that the Debtor's family consists of two persons: the Debtor and his wife. The $70 per month in board added an additional $840 to the Debtor's 1993 family income.

In conclusion, the court finds that the Debtor's 1993 family income ranged between $10,747 and $11,314. The federal government's poverty threshold for a family of two

---

11. USAF objected on the basis of hearsay to any use of Plaintiff's Exhibit 7 to establish that the Debtor suffered from a disability. The court sustained USAF's objection and admitted Plaintiff's Exhibit 7 for the limited purpose of establishing the Debtor's monthly income. Transcript at 18–22.

12. Federal Rule of Evidence 201(b) provides that a court may take judicial notice of facts that

either are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED.R.EVID. 201(b). *See also* Transcript at 210 (The court noted that it could take judicial notice of federal and state laws governing the duration of unemployment compensation.)

in 1993 was $9,430. Annual Update of the HHS Poverty Guidelines, 58 Fed.Reg. 8287, 8288 (1993). Therefore, the Debtor's family income for 1993 exceeded that threshold by approximately $1,300 to $1,900.[13]

From gross income ranging between $896 and $943 [14] per month, the Debtor must pay expenses of approximately $994 per month. At trial, the Debtor testified to the following monthly expenses: (1) rent of $390; (2) food of $200; (3) electric of $90; (4) gasoline for two cars of $80; (5) basic no-fault car insurance of $75; (6) phone of $75; (7) gas for home heating of $62; (8) water of $12; and (9) garbage collection of $10. Transcript at 173–174. The Debtor owns two cars: a 1985 Mercury Lynx and a 1986 Renault Alliance, both of which are paid off. Transcript at 177–78. Finally, the Debtor has current medical expenses of $1040.74 per month. Plaintiff's Exh. 8. Medicaid currently covers these expenses. Transcript at 84. The Debtor testified that at some point he would have to begin paying these medical expenses, but the Debtor offered no evidence as to when he would become responsible for payment. Accordingly, the court cannot consider the costs of medical care as expenses currently incurred by the Debtor.

Even without these medical costs, however, the Debtor cannot meet his monthly expenses. The court deems it unnecessary to nit-pick the Debtor's budgeted monthly expenses because it finds that the Debtor has minimized his family's living expenses. There is no fat in the budget to trim; even if there were, the court would have to trim expenses by more than $60 to $110 [15] per month in order for the Debtor to make the most minimal of payments towards his student loans. All of the items provided for are

necessities, such as rent, utilities, food, and transportation. The amounts budgeted are reasonable, not exorbitant. In addition, the Debtor has secured financial assistance, at various times, from different social service organizations. For example, in July of 1993, the Debtor received referrals to the Catholic Church and an organization named Love, Inc., both of which provided the Debtor with assistance with his electric bill. Plaintiff's Exh. 6 at 2; Transcript at 23. The Debtor also testified that the Catholic Church had provided funds to replace the starter in one of the family's cars and the Salvation Army had provided financial assistance to buy groceries. Transcript at 28.

The more difficult inquiry is whether the Debtor has maximized his financial resources. The Debtor appears to be extremely intelligent and has several degrees and a number of different skills. The Debtor holds a B.A. from Andrews with a Major in History and a Minor in Business Administration. Plaintiff's Exh. 5 at 3, 6. In 1989, he received his Masters of Arts in Religion from Andrews. *Id.* A year later he received a Bachelor's of Technology in Multi–Lingual Desktop Publishing. *Id.* The Debtor is quite proficient with computers and various software programs. On his current resume, the Debtor states that he is an expert in WordPerfect, MicroSoft Word, and Super-Calc 4, and that his education included work with MacIntosh computer systems. Plaintiff's Exh. 5 at 7. In addition, at trial, the Debtor testified that he knew how to operate an accounting package called DAC Easy and a laser printer control program called Laser Control. Transcript at 89. Although admitting to a lack of knowledge about program-

---

**13.** If the court considered the Debtor's son to be part of the Debtor's family for calculating family income, the court would include *all* of the son's 1993 unemployment income in the family income calculations. The Debtor's family income then would range between $12,013 and $13,147. Since the 1993 poverty threshold for a family of three was $11,890, the Debtor's family income under this scenario would exceed the poverty guidelines by approximately $120 to $1250. *See* Annual Update of the HHS Poverty Guidelines, 58 Fed.Reg. 8287, 8288 (1993). Under either scenario, however, the Debtor's family income is at or near the poverty threshold.

**14.** The court obtained these figures by taking the minimum and maximum annual income figures for 1993 and dividing them by twelve months.

**15.** The Debtor's current expenses exceed his current gross income by $50 to $100 per month. Thus, in order for the Debtor to make a minimal student loan payment of $10 per month, the court would have to trim somewhere between $60 and $110 per month from his monthly expenses. Moreover, this calculation assumes gross income figures.

ming computers, the Debtor did testify that his knowledge of computer operation was extensive; in fact, the Debtor referred to himself as a "power user." Transcript at 93. Finally, the Debtor has at least two years of sales experience. In 1988 and 1989, the Debtor was a manufacturing representative for Woodcutter Manufacturing. Transcript at 121. In fact, the Debtor's personal income tax returns for the taxable years 1988 through 1990 reveal that at least half of his taxable income was derived from sales. Plaintiff's Exh. 1, Schedule C to Form 1040 for 1988, 1989, and 1990. The court finds that the Debtor has a number of different skills, of varying marketability.

The Debtor, however, has not consistently and diligently looked for work. The court recognizes that illness, in part, has plagued the Debtor's efforts to retain employment. But the record shows that since completing his studies, the Debtor has allowed very long periods of time to pass in which he made little effort to locate *any* type of employment. Given the importance of this finding, the court believes a brief chronology of events is in order.

After completing his course work at Andrews in March of 1990, the Debtor began work with the Home Health Education Service's *Listen* Community Crusade Against Drugs. Transcript at 45; Plaintiff's Exh. 5 at 6. The Debtor terminated his association with *Listen* in October of 1990 because of

ulcers that had developed on both of his feet. Transcript at 46. About one month later, the Debtor overdosed on Halcion and spent two to three days at Berrien General Hospital and another three weeks at Mercy Memorial Center in St. Joseph. *Id.* He was released from the hospital some time in late 1990.

By his own admission, the Debtor has not "worked gainfully at a full-time job" since taking an overdose of Halcion in November of 1990. *Id.* From early 1991 until February of 1993, when the Debtor filed the instant adversary proceedings, the Debtor worked a total of approximately two months.[16] The court is less concerned, however, with the Debtor's failure to work than with his failure to diligently and consistently seek employment. During this same two-year period, the Debtor made *only five* employment inquiries (in addition to the applications for the part-time positions he held), all in the year preceding his filing of these adversary proceedings in February of 1993.[17] What the court finds startling is the contrast between the Debtor's efforts to secure employment *before* and *after* February of 1993. In the nine months from February until the time of trial in November, the Debtor made 22 employment inquiries, half of these within the month prior to trial.[18]

The court recognizes that a debtor may be unable to locate employment. Nonetheless, a debtor seeking a discharge of his student

---

**16.** The Debtor worked at the following jobs: (1) driving a dump truck for Andrews, which he quit after six weeks because the driving exacerbated the condition of his foot ulcers, transcript at 66–67; (2) teaching, on a substitute basis, for a day and a half for the Benton Harbor School District, *id.* at 68; Plaintiff's Exh. 5 at 11; (3) performing a weekend of temporary work for the owner of Beacon Services, transcript at 127; and (4) working on the Autumn 1992 edition of the Journal of Research in Christian Education, *id.* at 130.

**17.** Beginning some time in mid–1992, the Debtor applied for jobs with Cook Nuclear Plant, and for positions as a Case Manager with the Berrien–Cass–Van Buren Private Industry Council and in sales with Adams Remco. Plaintiff's Exh. 5 at 1, 2; Transcript at 122. In August of 1992, he registered with the Michigan Employment Security Commission ("MESC") and applied for work as a clerk, administrative assistant, or word processor. Transcript at 156; Plaintiff's Exh. 5 at 4.

The Debtor visited the MESC office again on January 7, 1993. Plaintiff's Exh. 5 at 4.

**18.** From February until November of 1993, the Debtor visited the MESC office seeking employment on three occasions, sitting for a typing test on his third visit. Plaintiff's Exh. 5 at 4, 9. He applied for work with Whirlpool and with the Berrien County Friend of the Court. (His application for a position with Whirlpool as a consumer assistance representative was still pending at the time of trial.) Plaintiff's Exh. 5 at 5, 10; Transcript at 122–23. In addition, he mailed six resumes in response to newspaper advertisements for administrative assistant positions. Transcript at 126. Finally, in the month before trial, he placed a work wanted ad in a local paper for ten days, *id.* at 152, and sent to ten of the temporary employment agencies in Benton Harbor and St. Joseph a letter stating his skills and requesting employment, preferably as an administrative assistant. *Id.* at 146.

loans must demonstrate that he has conscientiously tried to find work. Other than the Debtor's one-week hospitalization in May of 1991, transcript at 46, and the outpatient surgery on his left foot on January 29, 1993, *id.* at 69, little else exists in the record to explain the Debtor's almost complete failure to look for work in the two-year period from January of 1991 until February of 1993. Therefore, the court finds that the overall record reveals an absence of the level of diligence required of a debtor seeking discharge of student loans.

In conclusion, the Debtor currently cannot make even minimal monthly payments towards his outstanding student loans.[19] In addition, the Debtor has minimized his family's expenses. However, the Debtor has failed to show by a preponderance of the evidence that he maximized his financial resources.[20] Consequently, the Debtor does not satisfy prong one of the *Brunner* analysis.

### 2. *Additional, Exceptional Circumstances*

In order to obtain discharge of student loans, a debtor must demonstrate not only a current inability to repay his loans, but also "additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time...." *Brunner*, 831 F.2d at 396. *Brunner* requires this showing of additional, exceptional circumstances as a way to "guarantee" that undue hardship exists. Most courts agree that evidence showing a disability constitutes additional, exceptional circumstances satisfying prong two of the *Brunner* test. The issue in this case is whether the Debtor demonstrated by a preponderance of the evidence that he is disabled. This court concludes that as a result of evidentiary objections at trial it cannot now make a finding that the Debtor's medical problems give rise to a disability precluding him from gainful employment in the future.

The Debtor has had more than his share of medical problems since his graduation from Andrews. In October of 1990, he quit his job with the *Listen* program due to ulcers on both of his feet. Transcript at 46. In May of 1991, the Debtor was hospitalized for one week. *Id.* In 1992, the Debtor quit a job driving a truck for Andrews due to ulcers on his feet. *Id.* at 67–68. The Debtor also testified that he worked as a substitute teacher for one and a half days for the

19. In making this determination, however, the court did not consider the size of the Debtor's student loan indebtedness. It is the debtor, not the court, that makes the decision to borrow large sums of money to pursue a degree with limited earning potential. This court will not entertain a debtor's complaint that he is unable to make high monthly loan payments because his chosen field of endeavor offers limited financial rewards. If a debtor incurs large amounts of debt in pursuit of a degree with questionable or limited marketability, that is the debtor's responsibility. At trial, the Debtor explained that part of his difficulty in locating employment stems from the limited marketability of his degrees.

> I found that my M.A. in religion was of no value outside of Adventist church and my Bachelor of Technology was a very limited degree in that it dealt with a Multi Lingual Scholar program, which is in very limited use and it's IBM based as opposed to McIntosh [sic] based, and I only had one very brief course where I was taught things about the McIntosh [sic] computers.

Transcript at 73–74. While a debtor may be unable to locate work in his *chosen* field, that fact alone is not a basis for granting the debtor a discharge of his student loans. "[T]he *Brunner* test ... does not permit discharge of a student loan on the basis that the Debtor made a poor career choice (or was misled) in selecting the curriculum that the loan financed." *Kraft v. New York State Higher Educ. Servs. Corp. (In re Kraft)*, 161 B.R. 82, 85 (Bankr.W.D.N.Y.1993). Thus, this court will not take into consideration the *size* of monthly payments that a debtor must make in order to repay student loans within the traditional ten-year repayment period. Instead, the court will examine the debtor's income and compare that to federal poverty guidelines and the debtor's monthly expenses. If the debtor's income does not fall at or near the poverty level, the court will more carefully scrutinize monthly expenses to determine whether any fat may be trimmed from the debtor's budget. Absent discharge, the court will require any excess in the budget to be applied to the debtor's student loans, no matter how small the monthly payment.

20. The Debtor testified that he was in the process of renting a room in his house in order to secure some rental income, but at the time of trial this plan was in the embryonic stages, with no ads placed and no thought given to the amount of rent charged. Transcript at 133.

Benton Harbor School District; his second day of teaching was cut short to a half day because his leg began to swell and his blood pressure soared. *Id.* at 68. In addition, at trial, the Debtor testified that he had undergone six surgeries since the beginning of 1993: (1) an outpatient operation on his left foot on January 29; (2) laser surgery on his left eye on February 23; (3) surgery on his right eye in March; (4) surgery on his right eye and foot in May; (5) surgery on his left foot in July; and (6) surgery in October on his left eye because of a hemorrhage. *Id.* at 69. The Debtor testified that at the time of trial, he could not see out of his left eye. He also testified that he did not have enough information to then determine whether he would regain the vision in his left eye. *Id.*

■ The second part of the *Brunner* test requires the court to predict whether the Debtor's current financial and medical problems will continue unabated into the future. The Debtor's failure to produce admissible evidence of permanent or continuing disability, however, has transformed this second prong of *Brunner* into an exercise in crystal gazing. *Cf. John E. Green Plumbing & Heating Co. v. Turner Construction Co.*, 742 F.2d 965, 968 (6th Cir.1984), *cert. denied*, 471 U.S. 1102, 105 S.Ct. 2328, 85 L.Ed.2d 845 (1985) (damage awards may not be based on speculation or conjecture).

The Debtor testified to his medical problems. In addition, he offered an exhibit, to which the Defendants did not object, detailing the medications he takes and the treatments he undergoes each month. Plaintiff's Exh. 8; Transcript at 71. The medications taken support the Debtor's contention that he suffers from diabetes and hypertension. Plaintiff's Exh. 8.[21] These conditions, however, even in concert, do not necessarily disable

a person from seeking or retaining employment. Moreover, any other evidence of disability offered by the Debtor was excluded at trial after the Defendants' repeated hearsay objections.[22] *See, e.g.,* Transcript at 22 (court's ruling limiting admission of Plaintiff's Exhibit 7 to establish income from SSI, but not to establish disability); 25–26 (Defendant USAF's statement agreeing to admission of Plaintiff's Exhibit 6 consisting, in part, of a Michigan Department of Social Services Physician Sponsor Plan card, so long as the card was not admitted for the purpose of establishing the Debtor's physical condition); and 36–41 (court's ruling on Exhibit 5, excluding any hearsay that the Debtor was disabled).

As a result, this court basically has only the Debtor's uncorroborated testimony of his medical problems *until* the date of trial. That testimony explains the Debtor's failure to obtain gainful employment for the *ten months* prior to trial, when he was undergoing a number of different surgeries. It does *not* establish that the Debtor's current spate of medical problems constitutes a disability that will persist for an extended period of time into the future, making unlikely any repayment on the Debtor's student loans. The record does not establish any permanent or continuing disability; if the court made any finding of future medical problems, it would be merely an unwarranted guess. Thus, the Debtor fails to satisfy prong two of the *Brunner* test.

### 3. *Good Faith*

■ In determining the Debtor's good faith, the court must not only examine the Debtor's payments towards his student loans, but also his efforts to negotiate deferments with the applicable student loan agency. As

---

**21.** Plaintiff's Exhibit 8 lists Humulin L, Humulin R, and Altace as several of the medications taken by the Debtor. Humulin L is Lente Human Insulin while Humulin R is Regular Human Insulin; both are used by diabetics. PHYSICIANS' DESK REFERENCE 1232, 1235 (48th ed. 1994). Altace is used to treat hypertension. *Id.* at 1036.

**22.** At trial, the court recognized the dilemma faced by the Debtor who represented himself. Now I'm going to raise a practical issue here that I've been thinking about, by definition,

whether you may have an undue hardship on repayment of your student loan or not, you're a bankruptcy debtor and you do not have a lot of money, and we already have exhibits involving your tax returns which would show you do not make a lot of money. *So how does someone like you get the doctor in to testify and get the evidence in?* It's a [sic] very difficult, and in a case such as this, the Federal Rules of Evidence may be somewhat unfair.
Transcript at 36 (emphasis added).

the court noted in *Brunner*, asking for a deferment is "a less drastic remedy available to those unable to pay [student loans] because of prolonged unemployment." *Brunner*, 831 F.2d at 397. In addition, the timing of the Debtor's bankruptcy filing may affect the good faith analysis. A debtor who files for bankruptcy and seeks discharge of his student loans too soon after graduation has not given himself adequate time to find employment and to attempt to pay off his student loans. As a result, the court might be more reluctant to find good faith under such circumstances.

■ Although the Debtor has made no payments towards his student loans, he has not made sufficient income to do so since graduating from Andrews in 1990. The Debtor's income tax returns for the taxable years 1990, 1991, and 1992 reveal total income of $9,114, $7,999, and $8,259, respectively. The court refuses to find that the failure to make student loan payments constitutes bad faith when financial and health circumstances preclude such payments. *See Reilly v. United Student Aid Funds, Inc. (In re Reilly)*, 118 B.R. at 41 n. 2 (citations omitted) ("The mere failure to make a minimal payment on a student loan obligation does not prevent a finding of good faith where debtor has never had the resources to make such a payment.").

■ The Debtor filed for bankruptcy more than two and a half years after completing his Bachelor of Technology degree at Andrews. Prior to filing for bankruptcy, the Debtor made some arrangements for deferment of his student loans. Defendant's Exh. A; Transcript at 175–76. Thus, this case is distinguishable from others applying the *Brunner* analysis in which the Debtor filed for bankruptcy less than a year after graduating from school and without having made any arrangements to defer or negotiate payment of the loans. *Brunner*, 831 F.2d at 396 (Brunner filed for bankruptcy and discharge less than a year after graduating and without

first seeking deferment of the student loans.); *Healey v. Massachusetts Higher Educ. (In re Healey)*, 161 B.R. at 397 ("[Healey] filed for bankruptcy less than one year after her Masters degree was awarded, and did so without attempting to negotiate even a payment arrangement....") Based on the overall facts, the Debtor satisfies the good faith prong of the *Brunner* test.[23]

## V. REMEDIES

■ The threshold question any court must address in a proceeding under § 523(a)(8)(B) is whether a debtor satisfies the requirements for undue hardship as interpreted by binding or persuasive judicial opinions. If so, the court will hold that the debtor's student loans are dischargeable under § 523(a)(8)(B). *See, e.g., Reilly v. United Student Aid Funds, Inc. (In re Reilly)*, 118 B.R. at 42; *Wegfehrt v. Ohio Student Loan Comm'n (In re Wegfehrt)*, 10 B.R. at 832 (applying Commission analysis); *Pennsylvania Higher Educ. Assistance Agency v. Johnson (In re Johnson)*, 5 Bankr.Ct.Dec. at 545 (the *Johnson* test). To the contrary, if undue hardship is not shown, then the court will find the student loans to be nondischargeable. *See, e.g., Kraft v. New York Higher Educ. Servs. Corp. (In re Kraft)*, 161 B.R. at 87 (applying *Brunner* test); *Phillips v. Great Lakes Higher Educ. Corp. (In re Phillips)*, 161 B.R. at 949 (applying *Johnson* test); *Healey v. Massachusetts Higher Educ. (In re Healey)*, 161 B.R. at 397 (applying *Brunner* test).

However, even when debtors' student loans are nondischargeable, interesting remedies are sometimes fashioned by courts. Some courts have mandated payment schedules for the debtor to follow. *See, e.g., United States v. Hemmen (In the Matter of Hemmen)*, 7 B.R. 63, 67 (Bankr.N.D.Ala.1980) (The bankruptcy court held that the debtor's student loans might be discharged if the debtor used his best efforts to find a job and applied any income in excess of $3,600 per year, after taxes, to payment of his student

---

**23.** In 1981, the Debtor filed for relief under chapter 7 of the Bankruptcy Code. He was granted a discharge of a National Direct Student Loan in that prior bankruptcy case. Transcript at 110–112. Although the court has some concern over the Debtor's second attempt to discharge student loans, given the length of time between the cases, the prior student loan discharge itself does not negate the good faith finding.

loans for a period of five years from maturity of the last loan.); *Georgia Higher Educ. Assistance Corp. v. Densmore (In re Densmore )*, 8 B.R. 308, 309 (Bankr.N.D.Ga.1980) (no discharge but payment schedule established). Others have discharged only a portion of the total student loan indebtedness. *See, e.g., Woyame v. Career Educ. & Mgt. (In re Woyame )*, 161 B.R. 198, 203 (Bankr. N.D.Ohio 1993) (The court discharged approximately $2,200 of a total of $11,000 in student loans because "allowing the full amount of the debt to be ... nondischargeable would work an undue hardship upon the [debtor]."); *Littell v. State of Oregon (In re Littell )*, 6 B.R. at 89 (Decrying the "all or nothing approach" of some courts, the bankruptcy court ordered one loan discharged and the husband and wife debtors to each pay $10 on the remaining two student loans until the expiration of the five-year period then provided for under § 523(a)(8)(A).).

Finally, several courts have ordered deferments of student loan repayment ranging in length from one to four years. In *Medeiros v. Florida Dept. of Educ. (In re Medeiros )*, 86 B.R. 284 (Bankr.M.D.Fla.1988), the court declined the debtor's request for discharge of her student loans, in part, because of her good earning potential. Nonetheless, the court recognized that at the time of trial, the debtor faced tax liabilities and necessary expenses for surgery and counselling which caused her current expenses to exceed her current income. As a result, the court ordered a one-year deferment of the debtor's student loans. Similarly, in *In the Matter of Roberson*, 999 F.2d at 1138, the Seventh Circuit affirmed the bankruptcy court's two-year deferment of the debtor's student loans. Noting the bleakness of the debtor's immediate future, the court nonetheless agreed that the debtor had failed to prove that his "dire straits" were more than temporary. Thus, the court found a two-year deferment was reasonable in order to allow the debtor to recover financially. *See also Conner v. Illinois State Scholarship Comm'n (In re Conner )*, 89 B.R. 744, 750 (Bankr.N.D.Ill.1988) (The court ordered a four-year deferment of the debtor's student loans and required the parties to renegotiate the terms of those loans upon the expiration of that deferment.);

*Love v. United States (In re Love )*, 33 B.R. 753, 755 (Bankr.E.D.Va.1983) (The court incorporated the government's deferment offer into its order, placing a maximum two-and-one-half-year limit on the deferment period.).

Although the court in this proceeding cannot discharge the Debtor's student loans, it may order a deferment based on the Debtor's *current* situation. The Debtor's current expenses exceed his current income by $50 to $100 per month. *See supra* note 15 and accompanying text. Moreover, those income figures *include* unemployment income from the Debtor's wife. While the court cannot forecast the Debtor's income for 1994, it can note that unemployment terminates after a certain period of time. It is obvious to this court that the Debtor currently cannot make even a minimal payment towards his student loans. In addition, as in *Medeiros,* the Debtor's medical condition at and near the time of trial was not good. The Debtor underwent six surgeries in the 10–month period preceding trial. As in *Roberson,* the Debtor's *immediate* future appears bleak.

Accordingly, the court determines it appropriate to defer repayment on the Debtor's student loans for a period of one year from the date of this opinion. This one-year period will give the Debtor the opportunity to more diligently search for employment. In addition, it affords his spouse additional time to find work to replace the loss of her unemployment compensation. Finally, the deferment gives the Debtor the time to recover from the various surgeries he underwent in 1993. During the deferment period, the Debtor may recover his financial and physical health.

Upon the expiration of this one-year deferment on April 1, 1995, the Defendants may pursue any and all remedies available to them for collection of the outstanding student loan indebtedness. After all, the obligations are nondischargeable.

## VI. CONCLUSION

The Debtor in these consolidated adversary proceedings does not satisfy two of the three prongs of the *Brunner* test. Therefore, the court cannot discharge his student

loans on the basis of undue hardship. The court realizes that a layperson may believe this is a harsh result; but it is the statute that requires the Debtor to prove "undue hardship". The Debtor has shown current financial hardship coupled with serious health problems. However, he has failed to prove by a preponderance of the evidence that he has adequately sought employment and that his current financial and physical problems will persist for a significant portion of the loan repayment period. Accordingly, judgment will be entered which declares the Debtor's student loan obligations are not dischargeable under 11 U.S.C. § 523(a)(8)(B) and which orders a one-year deferment of those obligations, expiring on April 1, 1995.