In re Daniel M. DENNEHY,
M.D., Debtor.

Daniel M. DENNEHY, M.D., Plaintiff,

v.

Sallie MAE, Rush University, Defendants.

Bankruptcy No. 95–05033.
Adv. No. 95–80047.

United States Bankruptcy Court,
N.D. Florida,
Pensacola Division.

Oct. 21, 1996.

James Chase, Pensacola, FL, for plaintiff.

Robert Patton, Chicago, IL, for defendant Rush University.

David J. Hershman, Chicago, IL, for defendant Sallie Mae.

William Miller, Jr., Trustee, Tallahassee, FL.

### MEMORANDUM OPINION

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER came on for trial on plaintiff, Daniel M. Dennehy's (Dennehy) complaint seeking to discharge certain student loan obligations pursuant to the provisions of 11 U.S.C. § 523(a)(8). Originally named as defendants were Rush University and with regard to a Stafford Loan and a Health Education Assistance (HEAL) Loan the Student Loan Marketing Association (Sallie Mae). The United States of America was substituted for Sallie Mae with respect to the HEAL Loan, and the Illinois Student Assistance Commission was substituted with respect to the Stafford Loan. Thereafter, Dennehy and the United States stipulated to the nondischargeability of the HEAL loan. Consequently, the defendants at trial were Rush University and the Illinois Student Assistance Commission. Having considered Dennehy's testimony, the exhibits admitted into evidence, and arguments of counsel, I make the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### FINDINGS OF FACT

Dennehy filed for relief under Chapter 7 of the Bankruptcy Code on October 30, 1995. Dennehy brought this proceeding on November 15, 1995 in order to determine the dischargeability of his student loans pursuant to Section 523(a)(8)(B). This court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b), and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

Dennehy is a medical doctor. He received an undergraduate degree from the Universi-

ty of Notre Dame and a medical degree from Rush University Medical College located in Chicago, Illinois. In order to finance his medical education, Dennehy incurred student loan obligations subject to the provisions of 11 U.S.C. § 523(a)(8) in the following amounts:

| | |
|---|---|
| Sallie Mae–Stafford Loan | $ 38,485.00 |
| Rush University | 76,000.00 |
| Sallie Mae (HEAL) | 22,438.00 |
| Total Student Loan Debt | $136,923.00 |

Following his completion of medical school in 1990, Dennehy entered into the Medical University of South Carolina's family medicine residency training program. After completing one year of the required two-year residency program, Dennehy began suffering from severe psychiatric problems. This initially resulted in Dennehy's hospitalization from January to March 7, 1991. At that time, Dennehy was diagnosed as suffering from major depression with psychotic features. Subsequently, he was hospitalized again in December 1991, at which time the diagnosis was bi-polar disorder. This hospitalization lasted until January 1992. After taking a six-month leave of absence, Dennehy returned to the residency program in August of 1992. However, the family residency program subsequently terminated Dennehy from the program in March of 1993. Dennehy was hospitalized again in April 1993 to undergo electroconvulsive therapy (ECT) for his depression. Dennehy was discharged from this admission on May 12, 1993.

Dennehy then moved to Perdido Key, Florida, where he continued treatment on an outpatient basis. The treatment consisted of both drug and psychotherapy. For approximately two years, Dennehy suffered no relapses and did very well in his course of treatment. During this period he continued to pursue opportunities to continue his medical training, but with little success. In the summer of 1995, Dennehy successfully acquired a first-year residency position at a hospital in Williamsport, Pennsylvania.

Prior to entering into the program in Williamsport, Dennehy suffered a relapse while driving to Pennsylvania after having attended his sister's wedding in Minneapolis, Minnesota. He was hospitalized from June 19–24 in Indiana and when released from the hospital, returned to Pensacola, Florida where he was hospitalized from July 20–August 18. As a result, Dennehy did not begin the residency program in Pennsylvania. Except for the June 1995 episode which followed an extremely stressful situation, Dennehy's medical records indicate that he has been able to function normally so long as he takes his medication.

Since the summer of 1995, Dennehy has made numerous efforts to be admitted into another medical training program, but has been unsuccessful. At least at this point, it has become obvious to him that due to his illness, he will be unable to pursue a career as a practicing physician.

In December 1995, Dennehy moved to Chicago, Illinois to live with his girlfriend of approximately two years. Facing the reality of being unable to practice medicine, Dennehy sought other employment in various fields including factory worker, chemical laboratory technician, and pharmaceutical sales. His efforts were unsuccessful. He worked for a time at a tee shirt company and did some construction and dock work with Manpower, Inc. In January 1996, a friend helped him obtain a temporary position with Simon Marketing, Inc. working on a production line for promotional items. This job paid $15.00 per hour with overtime, and Dennehy was able to work twelve hours a day, seven days a week. This job terminated in July at which time Dennehy's accumulated savings totalled $7,000.

Dennehy's girlfriend testified via deposition regarding her relationship with him. Her testimony reflects that Dennehy's psychiatric problems do not interfere at all with their relationship. Her testimony was that Dennehy is totally independent and capably handles his own financial affairs. He regularly takes his medication on his own and has been stable since his last hospitalization in 1995. She also testified that they share their living expenses.

## CONCLUSIONS OF LAW

### A. Undue Hardship Standards

Section 523(a)(8)(B) of the Bankruptcy Code excepts student loans from discharge unless the loans first came due more than seven years prior to the filing of bankruptcy or failure to discharge would constitute an "undue hardship." Dennehy filed his petition for bankruptcy before the seven-year period. Accordingly, the only issue present is whether Dennehy satisfies the standards for "undue hardship" pursuant to 11 U.S.C. § 523(a)(8)(B).

Section 523(a)(8)(B) provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless—

.    .    .    .    .

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents; ...

11 U.S.C. § 523(a)(8)(B). The Code does not define "undue hardship" nor does the legislative history of Section 523. In deciding whether a particular set of facts constitute "undue hardship," two tests have developed. *See Brunner v. New York State Higher Educ. Serv. Corp.,* 831 F.2d 395 (2d Cir.1987)

(test consists of a current financial prong, a future financial prong, and a good faith prong); *Pennsylvania Higher Educ. Assistance Agency v. Johnson,* 5 Bankr.Ct.Dec. 532 (Bankr.E.D.Pa.1979) (test consists of a mechanical prong, a good faith prong, and policy prong). After extensive research on each of these tests, I adopt the test outlined in *Brunner* to determine "undue hardship" under 523(a)(8)(B).[1]

### B. *Brunner* Test Applied

In *Brunner,* the Second Circuit adopted a test that requires the debtor to prove by a preponderance of the evidence that:

(1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [themselves] and [their] dependents if forced to repay the loans;

(2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) the debtor has made good faith efforts to repay the loans.

*Brunner,* 831 F.2d at 396. If the debtor proves all three prongs of the test, an "undue hardship" exists and the loans are dischargeable. *Id.*

The first prong of the test requires the debtor to establish that current repayment of the student loans would cause the debtor to live below the minimum standard of living. *Id.* Dennehy has proved that his current financial situation does not allow him to repay his student loans and live at the minimum standard of living. Although Dennehy has saved $7,000 from his last job, Dennehy is not currently employed and is

---

1. The test outlined in *Johnson* is a three-prong test that requires the court to determine the debtor's current financial status, whether the debtor has tried to minimize expenses and maximize resources, and to determine whether the debtor has definitely benefitted financially from their education. It is the last prong of the test that has led other courts to reject the *Johnson* test. *E.g., Sands v. United Student Aid Funds* (Matter of Sands), 166 B.R. 299 (Bankr. W.D.Mich.1994); *Matter of Roberson,* 999 F.2d 1132 (7th Cir.1993). Because I do not want to engage in a subjective inquiry as to the financial benefits of an education, and also because I believe the *Brunner* test accomplishes Congress' intent in not freely allowing student loans to be discharged, I reject the *Johnson* test.

living off these savings. Therefore, Dennehy meets the requirements of the first prong.

■ Dennehy also meets the requirements of the third prong of the *Brunner* test. Under this prong, the inquiry focuses on whether the debtor has made a good faith effort to repay the student loans. *Brunner*, 831 F.2d at 396, 397; *see also, Matter of Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993). "Good faith" is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses. *Matter of Roberson*, 999 F.2d at 1136. Dennehy has tried to obtain gainful employment as a factory worker, a lab technician, and a pharmaceutical salesman since his last hospitalization in 1995. However, except for some temporary work, Dennehy has been unsuccessful at obtaining any of these positions. Dennehy has also tried to continue his medical education by applying to numerous residency programs. These attempts have also been unsuccessful. Furthermore, Dennehy has minimized his expenses and maximized his income by sharing living expenses with his girlfriend.

Additionally, the good faith prong examines whether the default on the student loans resulted from activities or factors beyond the debtor's ability to control. *Id.; see Perkins v. Vermont Student Assistance Corp.*, 11 B.R. 160, 161 (Bankr.D.Vt.1980) (debtor's purchase of a new car self-imposed the hardship); *In re Conner*, 89 B.R. 744, 749 (Bankr. N.D.Ill.1988) (debtor's decision to educate children at expensive private school self-imposed the hardship). In contrast, Dennehy's default did not occur from any purchase of luxury items, nor did he try to maintain a lavish lifestyle. The default occurred because of his bi-polar disorder resulting in his inability to complete the residency program and his medical career. Dennehy has tried in good faith to repay his student loans. Accordingly, he meets the requirements of the third prong of the *Brunner* test.

■ The second prong of the *Brunner* test is the sticking point. That prong requires the debtor to show that the current state of his financial affairs is not likely to improve in the future. *Brunner*, 831 F.2d at 396. This is the pivotal part of the *Brunner* test, because many debtors, like Dennehy, can establish their current financial problems. As described by one court, "the dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment." *In re Briscoe*, 16 B.R. 128, 131 (Bankr. S.D.N.Y.1981). In other words, this part of the test more accurately determines whether the hardship of repayment is *undue*. Dennehy did not prove that his current financial situation will persist for a significant portion of the loan repayment period. Nor, did Dennehy present any medical evidence that would suggest his bi-polar disorder would prevent him from obtaining well-paying employment, other than as a medical doctor. Instead, the evidence presented reveals that Dennehy is capable of working long, hard hours despite his disorder. The fact that Dennehy has been unable to obtain a well-paying job does not prove that his current financial straits will continue. In short, Dennehy presented no evidence from which I could determine, at this time, that his current financial situation would persist into the future. Therefore, Dennehy has failed to meet the requirements of the second prong of the *Brunner* "undue hardship" test. Accordingly, Dennehy's student loans are non-dischargeable.

## C. Remedies

■ Although Dennehy's student loans are non-dischargeable, that does not preclude this court from fashioning an equitable remedy. Generally, the availability of a remedy is determined by whether or not "undue hardship" is found: if an "undue hardship" exists, then a total discharge is granted, *Binder v. U.S. Dept. of Educ. (In re Binder)*, 54 B.R. 736 (Bankr.D.N.D.1985); if no "undue hardship" exists, then the loans are excepted from discharge. However, some courts do not see the dischargeability of students loans as an all or nothing proposition. *E.g., Chees-*

man v. Tenn. Student Assistance Corp. (In re Cheesman), 25 F.3d 356, 360–61 (6th Cir. 1994) (loans non-dischargeable, however court's order stayed for 18 months); Raimondo v. NY State Higher Educ. Serv. Corp. (In re Raimondo), 183 B.R. 677, 682 (Bankr. W.D.N.Y.1995) (partial discharge of student loans); Matter of Sands, 166 B.R. 299 (Bankr.W.D.Mich.1994) (loans non-dischargeable, however deferred payment for one year period). Instead, these courts use equitable remedies such as partial discharge,[2] deferred payment of the student loans,[3] deferred accrual of interest,[4] or stay the court's order when the student loans are non-dischargeable, but the debtor is not immediately able to commence payment of the debt. The remedies are used in order to give the debtor some leeway before payment of the student loans begin. E.g., Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman), 25 F.3d at 360–61. Although there is no standard developed to determine when one of these equitable remedies is appropriate, the facts of the cases using these remedies usually have one similarity—there is no indication that the current financial restraints will persist into the future and therefore, the loans are non-dischargeable. E.g., Matter of Roberson, 999 F.2d at 1137; In the Matter of Sands, 166 B.R. at 299. I am presented with the same factual situation: Dennehy has failed to prove his financial condition will persist into the future, and therefore, his loans can not be discharged by this court. However, like the cases above, this case represents a situation where one of these equitable remedies is appropriate. Therefore, I determine that deferring the collection of the debt and the accrual of interest for a two year period is the appropriate remedy in this case.

## D. Conclusion

Based on the Dennehy's medical history, and his recent lack of success in finding a permanent well-paying job, it is evident that he lacks the current ability to repay his student loans. However, given his educational background and his obvious intelligence, he should be able in the future to find gainful employment. In order to allow Dennehy sufficient time to find employment and arrange his financial affairs in order to pay the student loans, Rush University and Illinois Student Assistance Commission shall not collect on the debt for a two year period beginning from the date of this opinion. Furthermore, no interest on the debt shall accrue during this two year period. If, upon expiration of the two year period, Dennehy's financial condition has not improved, he may petition the court to reopen his case to present additional evidence regarding the second prong of the Brunner test, pursuant to Fed. R.Bankr.P. 4007(a) and (b).

A separate order shall be entered in accordance herewith.

### DONE AND ORDERED.

2. Some courts have held that it is beyond the court's power to grant a partial discharge of student loans. See Hawkins v. Buena Vista College (In re Hawkins), 187 B.R. 294 (Bankr. N.D.Iowa 1995); United States v. Kephart, 170 B.R. 787 (Bankr.W.D.N.Y.1994); Barrows v. Illinois Student Assistance Comm'n (In re Barrows), 182 B.R. 640 (Bankr.D.N.H.1994). Partial discharges are granted in some cases pursuant to 11 U.S.C. § 105(a). Under this authority, courts have determined that they may grant any order necessary to carry out the provisions of the Bankruptcy Code. See, e.g., In re Cheesman, 25 F.3d 356 (6th Cir.1994). The courts not allowing partial discharge do not interpret Section 105(a) broadly and, therefore, deny the partial dis-

charge. See Barrows, 182 B.R. at 654. I do not express any opinion as to how broadly or narrowly Section 105(a) of the Bankruptcy Code should be interpreted.

3. Matter of Roberson, 999 F.2d 1132, 1138 (7th Cir.1993) (two-year deferment of court's order denying discharge to enable debtor to financially reestablish himself).

4. Heckathorn v. United States ex rel. U.S. Dept. of Education, 199 B.R. 188 (Bankr.N.D.Okla.1996) (execution of collection stayed for five years and accrual of interest stayed for three years).