In re Cecelia B. HAWKINS, Debtor.

Cecelia B. HAWKINS, Plaintiff,

v.

BUENA VISTA COLLEGE; Eduserv Technologies, Inc.; Iowa Student Loan Liquidity Corp.; Loan Servicing Center; and Illinois Student Assistance Commission, Defendant.

Bankruptcy No. 94–30199XF.
Adv. No. 94–3034XF.

United States Bankruptcy Court,
N.D. Iowa.

June 29, 1995.

Charles A. Walker, Fort Dodge, Iowa, for Plaintiff/Debtor.

David J. Hershman, General Counsel, ISAC, Chicago, Illinois, for Illinois Student Assistance Commission.

WILLIAM L. EDMONDS, Chief Judge.

The matter before the court is the final trial of Cecelia Hawkins' complaint to determine the dischargeability of her student loan obligation to Illinois Student Assistance Commission (ISAC). Trial was held May 18, 1995 in Fort Dodge, Iowa. Charles A. Walker appeared for Hawkins. David J. Hershman appeared for ISAC. The court now issues its findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

*Findings of Fact*

Cecelia Hawkins filed a Chapter 7 bankruptcy petition on February 10, 1994. She scheduled three unsecured creditors with claims relating to student loans: Buena Vista College for $571.46, Eduserv Technologies, Inc. as the collection agent for Buena Vista, and Loan Servicing Center in the amount of $28,271.75. On April 4, 1994 Hawkins filed a complaint to determine the dischargeability of her student loan obligations. ISAC defends the complaint as the current owner of the student loan debt formerly owed to Loan Servicing Center.

Hawkins is 39 years old. She and her husband divorced in February, 1984. She has four children ages 19, 16, 14 and 11. The three youngest children are at home with their mother. The oldest child is a student at Iowa Lakes Community College in Estherville, Iowa. He does not receive financial support from Hawkins. Hawkins is in good health. There was no evidence that her children have any health problems.

Hawkins began her college education in September, 1984 at Iowa Central Community College in Fort Dodge. She was 28 years old. She attended school full time and graduated in the spring of 1986 with an associate degree in agricultural consumer finance. Financial assistance was available for a two-year degree through a program sponsored by Job Service of Iowa and the Department of Human Services. She did not incur student loan debt while at the community college. After graduation, she worked for General Adjustments Bureau in Fort Dodge for approximately one year.

Hawkins enrolled at Buena Vista College in Storm Lake, Iowa in the fall of 1988. Her four children then ranged from age 4 to eighth grade. She financed her education with student loans. After attending full time for three years, Hawkins graduated in May, 1991 with a bachelor's degree in elementary education. Her grade point average was 2.86.

Since graduation, Hawkins has attempted without success to obtain a teaching position. She has received rejection letters (Exhibits 4–25, 34–38) or no response to her applications. There have been hundreds of applications for some of the positions she has sought. She has applied to schools in the northwest Iowa area so she could commute or move a relatively short distance. Her parents and two brothers live in Iowa. She does not want to move her children out of the area. She believes after her youngest child has graduated from high school she would be more free to seek employment in a wider

area. At one time she lived in Arizona; she has two sisters living there now. In June 1992, she traveled to Arizona. She had an interview there but did not receive an offer of employment. She does not have the money to move a long distance.

Hawkins has attempted to obtain other employment relating to her interests and experience. She applied for a position as a group home coordinator, director or shift worker. Exhibit 34. She has experience working with the mentally ill, but her degree did not include special education training. She has inquired about jobs at banks and insurance companies. Some employers indicated they would not want to train her if she might leave for a teaching position.

Hawkins has worked at a number of places since graduation. In February, 1994, she stated in her Chapter 7 Schedule I that she had just begun working at Iowa Beef Packers. At trial, she submitted pay stubs showing that in August, 1994, she was working at Methodist Manor, a nursing home, for $5.00 per hour and at Wal–Mart for $5.10 per hour. Exhibits 27, 28. Hawkins explained that she left those jobs because she was unable to care for her children while working two jobs. She has had irregular assignments as a substitute teacher. She had one long-term assignment in a non-teaching position at East Elementary in Storm Lake working one-on-one with a student with a behavior disorder. This job offered no insurance or benefits, and paid $6.50 per hour only for the time the student actually attended school. Hawkins hoped this position would lead to a teaching position. However, the school filled four positions last spring and Hawkins was not among the finalists for an interview. On the day of trial, she had just begun working as a checker at Hy–Vee for 37 hours a week, $5.00 per hour. She will be trained as a courtesy cashier. The job is considered part-time and provides no benefits. Hawkins has told Hy–Vee that she would like to be considered in the event that a full time position becomes available.

Hawkins reported income of $8,615 on her 1992 federal income tax return (Exhibit 2), $11,634 in 1993 (Exhibit 1), and $8,200 in 1994 (Exhibit 33).

Hawkins receives public assistance in the form of an "FIP" benefit and food stamps. Exhibit 32. The amount she receives varies, depending in part on the amount her former husband pays for child support. He makes the support payments to the State of Iowa as long as Hawkins receives public assistance. The highest amounts she has received have been $250 per month for FIP payments, and between $200–250 for food stamps.

Hawkins has not made any payments on her student loan obligation to ISAC. The amount now owing, with accrued interest, is approximately $30,352.

## Discussion

■ Student loan obligations are ordinarily dischargeable in bankruptcy only in a case filed after seven years from the date the loan first became due. 11 U.S.C. § 523(a)(8)(A). See generally 3 Collier on Bankruptcy ¶ 523.18 (15th ed. 1995); 3 Norton Bankruptcy Law & Practice 2d § 47:48 (1994). Cecelia Hawkins seeks an order determining that her student loan obligation is dischargeable pursuant to 11 U.S.C. § 523(a)(8)(B), which provides that such debts may be dischargeable within the seven-year period if:

excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8)(B).

■ The burden of proof of undue hardship is on the debtor. *Cadle Co. v. Webb (In re Webb)*, 132 B.R. 199, 201 (Bankr.M.D.Fla. 1991). Courts have used a variety of methods for determining what constitutes "undue hardship" under § 523(a)(8)(B). See 3 Norton Bankruptcy Law & Practice § 47:48 at 47–107 to 47–110 (identifying four approaches). The Bankruptcy Code does not define the term.

The court in *In re Johnson*, 5 Bankr.Ct. Dec. (CRR) 532 (Bankr.E.D.Pa.1979), developed a three-part test of undue hardship that has been followed by many courts. For the text and discussion of the *Johnson* test, see *Matter of Roberson*, 999 F.2d 1132, 1134–35 (7th Cir.1993), and *Koch v. Pennsylvania Higher Education Assistance Agency (In re Koch)*, 144 B.R. 959, 963–64 (Bankr.W.D.Pa.

1992). Part one of the *Johnson* test is termed a "mechanical test" that examines the debtor's present and future ability to repay the student loan. The court considers the debtor's circumstances by looking at the following factors:

(1) Present employment and income;

(2) Future employment and income potential;

(3) Educational level and skills;

(4) Marketability of those skills;

(5) Debtor's health;

(6) Debtor's family support responsibilities.

*Koch*, 144 B.R. at 963. Part two is an inquiry into the debtor's efforts to minimize expenses and maximize income as a test of the debtor's good faith. *Roberson*, 999 F.2d at 1134–35. The third part of the *Johnson* test is a "policy test" that asks two questions: whether the debtor's primary purpose in filing bankruptcy has been to discharge the student loan and whether the debtor "has definitely benefitted financially from the education which the loan helped to finance." *Id.* at 1135.

■ In *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir.1987), the court adopted its own three-part test for determining undue hardship. Under the *Brunner* test, the debtor must show:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396. The requirements of the *Brunner* test are similar to those of the *Johnson* test. Both tests examine the debtor's present circumstances, prospects for the future, and good faith efforts. The primary distinction is that the *Brunner* test does not inquire whether the debtor benefitted financially from her education. *Roberson*, 999 F.2d at 1136.

■ Two circuit courts have applied the *Brunner* test for undue hardship: *Roberson*, 999 F.2d 1132, 1135 (7th Cir.1993) (expressly adopting *Brunner* rather than *Johnson* test), and *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 359–60 (6th Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995) (reviewing facts under *Brunner*; bankruptcy court did not specify which test used). The Seventh Circuit in *Roberson* discussed the rationale for each of the three parts of *Brunner* as tests of undue hardship. *Roberson*, 999 F.2d at 1135–36. The first part, that the debtor is currently unable to repay the loan and maintain a minimal standard of living, is considered a minimum requirement dictated by common sense. *Id.* at 1135. The second part of the test requires a debtor to show that her critical financial condition is likely to continue for an extended period of time. It is a common situation for a recent graduate to be in poor financial condition. However, the graduate is likely to enjoy higher levels of income in the future as a benefit of her education. Dischargeability should be based on a "certainty of hopelessness" of repayment, rather than a present inability to repay student loans. *Id.* at 1136. The third part of the test examines the debtor's good faith efforts to repay the loan, the quid pro quo for receipt of a government-guaranteed student loan. Hardship may not be considered "undue" for purposes of § 523(a)(8)(B) if a debtor's financial condition is a result of her own negligent or irresponsible conduct. *Id.*

■ This court agrees with the analysis in *Roberson* and will apply the *Brunner* test in this case. In particular, the court agrees that it is not an appropriate test of undue hardship to determine whether the debtor has benefitted financially from her education. Congress' decision to implement the student loan program was not a decision to insure a student's future financial success. *Id.* at 1136–37. The government should not have to bear the loss if a student chooses to borrow money to pursue an unmarketable degree. *Sands v. United Student Aid Funds, Inc. (Matter of Sands)*, 166 B.R. 299, 306 (Bankr.W.D.Mich.1994). Moreover, a

college education has more than economic value.

In closing argument, Hawkins' counsel cited *Correll v. Union National Bank of Pittsburgh (In re Correll)*, 105 B.R. 302 (Bankr.W.D.Pa.1989), which raises a different but related issue. The *Correll* decision consolidated five § 523(a)(8)(B) adversary proceedings. The court's opinion included a criticism of proprietary trade schools. *Id.* at 304–05. In one case, the debtor, Rugh, had obtained a "Doctor of Motors" degree, which the court found left him without "the necessary qualifications and skills to obtain employment." *Id.* at 307. A debtor's work skills affect her prospects for employment, and thus, the ability to repay a student loan. Under *Brunner*, the court will consider the debtor's ability to find employment and her earning capacity, whether or not the debtor's employment qualifications and skills were acquired through the education financed by the student loan at issue. Hawkins cannot convince the court that she acquired no employment qualifications or skills from an education degree from a four-year college. The court will not consider whether Hawkins received a financial benefit from her degree in terms of whether the degree enabled her to obtain a teaching job.

The court will now consider the *Brunner* test as applied to the facts of this case. ISAC concedes that Hawkins meets the first requirement. Her current financial condition prevents her from making student loan payments while maintaining a minimal standard of living for herself and her three dependents. She qualifies for public assistance. She has little money, if any, in her bank accounts. She drives a 1981 car. Hawkins offered exhibits to show some of her monthly expenses. Exhibits 29–31. ISAC does not argue that these living expenses are unreasonable.

ISAC suggests that the money Hawkins spends on cigarettes could be used to make a payment toward her student loan. Hawkins testified that she smokes less than a pack of cigarettes per day. There was no evidence on the amount of this expense. It is likely that Hawkins could justifiably spend any such money on necessities for herself and her children. The court does not consider the cigarette expense a significant factor in its decision.

The court concludes that Hawkins has also met the third requirement of the *Brunner* test, that she has made a good faith effort to repay the loan. ISAC argues that Hawkins' failure to make even a minimal payment on the loan precludes a finding of good faith. A debtor's good faith is measured by her "efforts to obtain employment, maximize income and minimize expenses," and by inquiring whether the debtor is culpable for causing her own poor financial condition. *Roberson*, 999 F.2d at 1136. Therefore, the test of a debtor's good faith must take into account her ability to pay.

Hawkins has made numerous efforts to obtain employment at the highest level for which she was qualified. Her search for teaching jobs was limited to the geographic area of northwestern Iowa, but her explanation for that limitation is reasonable. When her efforts to obtain a teaching job were not successful, she made attempts to find employment in other areas related and unrelated to her particular skills and interests. In the last three calendar years, the most she has earned to support herself and her three children was $11,634 in 1993. Exhibit 1. Hawkins has had no greater ability in past years to make payments on the loans than she has now. The court finds that she has made a good faith effort to repay the loans.

The court next considers the remaining part of the *Brunner* test, whether there are additional circumstances which make it likely that Hawkins' financial condition will persist for a significant portion of the repayment period. There was no evidence on the term of the repayment period for her loan or when the loan first became due. Assuming the usual 10-year period and assuming a six-month grace period after her spring 1991 graduation, the term will continue for approximately six and a half more years. If Hawkins has obtained a deferment of the repayment period, the remaining period is longer.

Hawkins argues that she has been unable to secure a teaching position and that the

jobs she has been able to find pay little more than minimum wage. Hawkins' hopes of obtaining a teaching job are apparently waning. From the dates of the rejection letters admitted as evidence, it appears that she has made the greatest number of applications in 1991, and fewer in more recent years. Work as a teacher substitute has been too irregular. Hawkins must have permanent work to support her family, which prevents her from being available for the work as a substitute. The longer she goes without obtaining teaching experience, the more difficult it will be to be hired as a teacher. Each year she will be competing with an additional pool of new education graduates for whatever positions are available.

There is no doubt that Hawkins' present financial condition is a hardship. However, the court concludes that Hawkins has not shown additional circumstances indicating that her present situation is likely to persist. The court has observed Hawkins' demeanor. She presents herself as an intelligent person; she has a good education; she is in good health. She now works at Hy–Vee because of her difficulty finding suitable employment since graduation. Hawkins is perhaps correct in believing that she will not obtain a teaching position. However, the court is not persuaded that working at Hy–Vee is a long-term prospect for her. Other jobs which Hawkins has applied for presumably would better suit her because of her education and experience. Hawkins explained that some employers were concerned she would leave the job for a teaching position. If more time goes by during which she does not secure a teaching position, she will be better able to convince an employer (and herself) that she wants to make a career of doing something else. In addition, Hawkins' children will no longer be dependent on her for support as they grow older. Her oldest child at home is now 16 years old. The court concludes that Hawkins has not met her burden of showing that her present financial situation is likely to continue. Her student loan obligation to ISAC will be excepted from her discharge.

■ Although ISAC objects to the dischargeability of Hawkins' student loan, ISAC indicates it would be willing to accept loan payments based on Hawkins' ability to pay. ISAC requests the court to fashion a repayment schedule. It suggests a sliding scale plan under which Hawkins would make monthly payments of a certain amount depending on her level of earned income. The court disagrees with ISAC's conclusion that the court has the power to rewrite the terms of Hawkins' loan payments. The court's authority under § 523 is to determine dischargeability. This is an all-or-nothing proposition. The court acknowledges that several courts have concluded otherwise. These courts have assumed the power to discharge part of a student loan, fashion a repayment plan or order a deferment of payments. See, e.g., *Littell v. Oregon Board of Higher Education (In re Littell)*, 6 B.R. 85, 89 (Bankr. D.Or.1980) (court ordered each debtor to pay $10 per month until the end of the discharge period); *Silliman v. Nebraska Higher Education Loan Program (In re Silliman)*, 144 B.R. 748, 752 (Bankr.N.D.Ohio 1992) (reduced debt from $6,711.36 to $3,000); *Sands v. United Student Aid Funds, Inc. (Matter of Sands)*, 166 B.R. 299, 313 (Bankr.W.D.Mich. 1994) (court ordered one-year deferment of payments due to debtor's present medical condition). Some courts rely on 11 U.S.C. § 105 as authority to adjust a repayment schedule or to discharge part of a student loan. In *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir.1994), *cert. denied* — U.S. ——, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995), the court held that the bankruptcy court had the power under § 105 to grant an 18–month stay of its order discharging a student loan to see if the debtor's financial situation improved. See also *Conner v. Illinois State Scholarship Commission (In re Conner)*, 89 B.R. 744, 750 (Bankr.N.D.Ill.1988) (court not prevented from "fashioning a more equitable repayment schedule," citing § 105). Other courts apparently justify their decisions on equitable grounds, with little or no analysis of the lack of express authority in § 523 of the Bankruptcy Code to do other than decide dischargeability. In *Littell*, without citation, the court explained its decision to revise the debtor's repayment schedule:

> Even though it might be undue hardship for a debtor to repay the entire loan, some

payment might be feasible. Instead of the all or nothing approach, the courts should consider whether only part of the debt should be nondischargeable and what monthly payment the debtor could afford. *Littell*, 6 B.R. at 89. Several courts cite *Littell* for partial support. See, e.g., *Silliman*, 144 B.R. at 752; *Sands*, 166 B.R. at 313. In *Georgia Higher Education Assistance Corp. v. Bowen (In re Bowen)*, 37 B.R. 171 (Bankr.M.D.Fla.1984), the court entered an order restructuring the debtor's loan payment. While conceding that the literal language of § 523 did not grant such authority, the court cited cases which had concluded this authority was "within the policy" of the statute. *Id.* at 173. In *Matter of Roberson*, 999 F.2d 1132, 1134 (7th Cir.1993), the bankruptcy court had denied the dischargeability of the debtor's student loans, but ordered a two-year deferment of payments. The Seventh Circuit held that the bankruptcy court's factual findings supported denial of dischargeability, without comment on the court's authority to order a deferment. *Id.* at 1138.

▪ The language of 11 U.S.C. § 523(a)(8) does not authorize the court to fashion a repayment schedule for student loans. *Bowen*, 37 B.R. at 173. Although it is arguably a more equitable approach, Congress has not given bankruptcy courts the authority to rewrite student loans. See Thad Collins, Note, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy as an Impetus to Amend 11 U.S.C. § 523(a)(8)*, 75 Iowa L.Rev. 733, 762 (1990) (proposing amendment to § 523(a)(8) to allow partial discharge, deferral of repayment or restructure of payments). Congress could have provided that student loans will be dischargeable "to the extent" excepting such debt will impose undue hardship upon a debtor and her dependents. Congress used that phrase numerous times elsewhere in the Bankruptcy Code, including three other subdivisions of the dischargeability statute, 11 U.S.C. §§ 523(a)(2), 523(a)(5), and 523(a)(7). The United States Supreme Court has applied a rule of statutory construction by which Congress' failure to include language is presumed intentional where it has used the language elsewhere in the same statute.

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522–23, 104 S.Ct. 1188, 1194, 79 L.Ed.2d 482 (1984).

▪ Moreover, the bankruptcy court's power under § 105 is not a limitless authorization to do whatever seems equitable. The court may not use § 105 to effect a result in conflict with other sections of the Bankruptcy Code or with other law which the court ought to consider in the exercise of its discretion. *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549–50, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990). The court may not use § 105 to expand the debtor's substantive rights. *Johnson v. First National Bank of Montevideo*, 719 F.2d 270, 274 (8th Cir.1983), *cert. denied*, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). Other courts have declined to revise student loan payment schedules. In *Wardlow v. Great Lakes Higher Education Corp. (In re Wardlow)*, 167 B.R. 148, 152 (Bankr.W.D.Mo.1993), the court declined to restructure the student loan debt, concluding that it had authority under § 523(a)(8) only to determine the dischargeability of the student loan. The court said that rewriting a loan would effectively convert the case to a reorganization case without the procedural and substantive safeguards provided in Chapter 13. *Id.* at 152–53. *Accord Courtney v. Gainer Bank (In re Courtney)*, 79 B.R. 1004, 1012–13 (Bankr.N.D.Ind. 1987). This court concludes that it does not have the authority either under § 523(a)(8) or § 105 to order a revised schedule of Hawkins' student loan payments.

The language of § 523(a)(8) excepts from the discharge debt for "an educational benefit overpayment or loan" or "an obligation to repay funds received as an educational benefit, scholarship or stipend." This decision is not a ruling on whether separate claims may be discharged.

*Decision*

▪ ISAC is the only defendant who prosecuted a defense to the complaint. Default of record was entered against Buena Vista College and Eduserv Technologies, Inc. on June 10, 1994. Documents 7 and 8. Defendants Loan Servicing Center and the

Iowa Student Loan Liquidity Corporation were served July 5, 1994; they have not appeared or defended the complaint. A plaintiff is not necessarily entitled to judgment against a defaulting defendant before the merits of the case are tried. The court may enter a final judgment against fewer than all the parties in a case only upon an "express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed. R.Civ.P. 54(b). A final judgment against one defendant on the merits before the plaintiff's claim is tried could result in incongruous judgments. *Frow v. De La Vega,* 82 U.S. (15 Wall.) 552, 554, 21 L.Ed. 60 (1872). A rule has developed following *Frow* that after trial on the merits, if the plaintiff is not entitled to judgment against the litigating parties, the complaint should be dismissed as to defaulting parties as well. *Id.;* 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 2d § 2690 at 457 (1983). The rule was first applied in cases involving defendants whose liability would be joint and several. The authors of a leading treatise suggest that the rule should apply in cases when defendants have closely related defenses or it is important to have consistent judgments as to all defendants. Charles A. Wright, Arthur R. Miller & Mary Kay Kane at 458 & Supp. (1995). In *Farzetta v. Turner & Newall, Ltd.,* 797 F.2d 151 (3d Cir.1986), the court stated that the rule in *Frow,* as applied in cases not involving joint and several liability, is:

> if at trial facts are proved that exonerate certain defendants and that as a matter of logic preclude the liability of another defendant, the plaintiff should be collaterally estopped from obtaining a judgment against the latter defendant, even though it failed to participate in the proceeding in which the exculpatory facts were proved.

*Farzetta,* 797 F.2d at 154. In Hawkins' case, the court has found the debt to ISAC excepted from her discharge because of her failure to prove that her current financial situation will persist. ISAC's defense was not personal to it. The court's ruling applies logically to any debt owed to the defaulting parties.

Therefore, the complaint should be dismissed as to all defendants.

## ORDER

IT IS ORDERED that the complaint of Cecelia Hawkins is dismissed. Judgment shall enter accordingly.

SO ORDERED.