**In re Clare Creek (LeDuff) KELSEY, Debtor,**

**Clare Creek (LeDuff) Kelsey, Plaintiff,**

**v.**

**Great Lakes Higher Education Corporation; A.M. Miller; USA Group Guarantee Services, Inc.; Student Services, Inc.; Graduate Loan Center; Zwicker and Associates, P.C.; Nevada Department of Education; Van Ru Credit Corp.; NCO Financial Systems, Inc.; Diversified Collection Services, Inc.; Citibank (South Dakota), N.A.; Aman Collection Service, Inc.; the ED Fund/California Student Aid Commission; Ameritrust of Cleveland; Citi-**

**bank N.Y. State; Mellon Bank Maryland; Mellon Bank NA; Philadelphia Higher Education Assistance Administration; Student Loan Marketing Assoc. and Keybank USA, Defendants/Respondents.**

**Bankruptcy No. 94–10415.
Adversary No. 00–1034.**

United States Bankruptcy Court,
D. Vermont.

Oct. 23, 2001.

John Thrasher, Esq., Montpelier, VT, for Plaintiff.

Gregory A. Weimer, Esq., Little, Cicchetti & Conrad, Burlington, VT, for TERI.

Gary L. Franklin, Esq., Eggleston & Cramer, Ltd., Burlington, VT, for ECMC.

### MEMORANDUM OF DECISION BASED UPON TRIAL ON THE MERITS

COLLEEN A. BROWN, Bankruptcy Judge.

The plaintiff, Clare Creek (LeDuff) Kelsey (referred to herein as "the debtor"), has filed a Complaint seeking a final judgment of this Court determining that she is entitled to a discharge of the student loan obligations she owes to the defendants, based upon undue hardship pursuant to 11 U.S.C. § 523(a)(8). The parties have stipulated that this is a core proceeding and this Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. For the reasons set forth below, the Court holds that the subject student loans are dischargeable.

### BACKGROUND

1. *Procedural Background*

On July 14, 1994, the debtor filed a voluntary petition for relief under chapter 7 of title 11 U.S.C. ("the Bankruptcy Code"). An Order Discharging the Debtor and a Final Decree were entered and the case was closed on November 8, 1994. On February 15, 2000, the debtor filed a Motion to Reopen Case in order to seek an undue hardship discharge of certain law school and post graduate student loans. The Court granted the motion on March 28, 2000 and the debtor initiated this adversary proceeding on June 1, 2000 by filing "Debtor's Petition for Hardship Discharge" seeking a hardship discharge

based solely upon 11 U.S.C. § 523(a)(8). In the petition, the debtor alleges that she is unable to maintain a minimal standard of living, that she suffers from psychiatric and emotional disabilities, and that she has made good faith efforts to repay her school loans. The debtor subsequently filed a motion to amend the initial pleading to conform with certain requirements of the Local Rules; that motion was unopposed and granted. The defendant, Educational Credit Management Corporation ("ECMC"), filed an Answer denying the allegations of the petition. In its Answer and Affirmative Defenses, the defendant, The Educational Resources Institute ("TERI"), likewise denied the material allegations of undue hardship and asserted a Counterclaim for payment of its loans and attorneys fees. The debtor filed an Answer to the Counterclaim opposing all relief requested by the defendants. Other named defendants have been voluntarily dismissed.

A succession of motions, protracted discovery disputes and related papers have been filed by the parties. On September 11, 2000, the debtor filed a Motion for Leave to Amend Complaint seeking certain non-substantive changes in the initial pleading, including a request to recast the pleading as an Amended Complaint rather than a "petition." The motion was unopposed and granted, and the defendants each filed an answer to the debtor's Amended Complaint for Hardship Discharge, with each defendant denying the material allegations of the Amended Complaint. While the Amended Complaint reconfigured the original allegations and the title of the pleading, the sole basis for relief remained the undue hardship discharge provisions of § 523(a)(8) of the Bankruptcy Code. There are no allegations of breach of contract or prayers for relief pursuant to Title IV of the Higher Education Act set forth in the Amended Complaint.

On January 4, 2001, the debtor filed a Motion for Summary Judgment. The Court denied the motion based upon a determination that genuine issues of material fact existed regarding, *inter alia*, the nature and extent of the debtor's disability, her earning capacity and her good faith efforts to repay these student loans. A two-day non-jury trial commenced April 19, 2001, and this Court reserved judgment to further consider the evidence presented and applicable law.

### 2. *The Undisputed Evidence*

The salient facts in this matter focus on three distinct but critically interrelated sequences of events: the debtor's education history, the debtor's employment history and the debtor's health history. In the interest of clarity, the three historical sequences are merged into a single chronology. Many pertinent facts relating to each of these sequences are generally not in dispute. *See Joint Stipulation of Facts* dated January 12, 2001 [dkt # 86–1] (referred to herein as "SF"), as adopted by the parties in their Joint Pretrial Statement filed April 14, 2001. What are in dispute, however, are first, the significance and reliability of the debtor's work history, and second, the impact of the debtor's health on both her ability to work and her efforts to repay the loans.

As of the date of the trial, Clare Creek (LeDuff) Kelsey was fifty years old, not married and had no dependents (SF 1). She owed student loans to the two defendants in an aggregate amount totaling just over $158,000 (referred to herein as "the student loan balance") (SF 40, 69). The loans in question were incurred to defray the debtor's law school and master's degree educational costs and related expenses.

The debtor's educational history is rather protracted. She began her undergraduate studies by taking part-time courses at a local community college and then at a small extension campus of the University of Michigan, where she had a pattern of signing up for two courses, going most of the way through the semester and then late in the semester dropping one or both of the courses (SF 8). In 1978, the debtor decided to go to college full-time and enrolled at the University of Nevada at Las Vegas (hereafter "UNLV") where she financed a portion of her schooling with student loans (SF 9). In 1981, the debtor transferred to San Diego State University where she completed her bachelors' degree in 1984, approximately six years after commencing her undergraduate studies (SF 11, 13).

The debtor began law school in 1984 when she enrolled as a full-time student at the University of San Diego School of Law (hereafter "USD") (SF 13). Ultimately, the debtor started law school three times, each time *de novo* (SF 14). She commenced her study in 1984, attended law school for one year, withdrew from school in the late fall or early winter, and then tried twice again over the next few years, never making it beyond the middle of the winter/spring semester (SF 14). Before beginning law school for the third and final time, the debtor sought counseling, and consulted with Diane Kulstad, MSW (SF 15). She was undergoing a separation from her second husband at this time (SF 15). Prior to her first meeting with Ms. Kulstad, the debtor had never heard of clinical depression (SF 16), and the debtor had never entertained the notion that she might have a mental or psychological impairment both because the concept was unknown to her and because of her tested high intelligence (SF 12). After beginning treatment with Ms. Kulstad, the debtor re-entered law school in 1989 (SF 17). She attended classes primarily in the night class program because that curriculum required fewer credits per semester, as most of the night students had full-time day jobs (SF 19). The following spring—the third time she was a second semester law student at USD—the debtor was selected to write for law review (SF 17, 18). At USD, an invitation to write for law review was based upon grades; her invitation was based upon the fact that she was number seven in a class of 85 and hence in the top 10% of her class (SF 17). The debtor reportedly graduated from USD law school in 1993. The combined amount of the student loan balance allocable to the debtor's law school education is stipulated to be approximately $ 76,290 as of January, 2001 (SF 43, 51, 55, 59, 63).

The debtor began her Master's degree studies in 1993 when she moved to Vermont to attend the Master's program in environmental law at the Vermont Law School (hereafter "VLS") (SF 23). She earned her master's degree *cum laude* from VLS in May, 1995. The combined amount of outstanding student loans allocable to debtor's graduate education is stipulated to be approximately $ 81,725 as of January, 2001 (SF 43, 67).

The debtor filed a petition seeking relief under chapter 7 of the Bankruptcy Code in the summer of 1994. The parties have stipulated that the debtor "made it very clear to her attorney and at least one of the defendants in this action that she filed bankruptcy with the intent to be in a position when she came out of law school to get a good job and pay her student loans within ten years" (SF 25). The parties further stipulate that her attorney told her she had to schedule her student loans even though they were not dischargeable, which she did, and she scheduled $1,400 each month in student loan payments in her schedule J budget, which was to have dem-

onstrated that she was not seeking to discharge her student loans at the time (SF 26). Prior to re-opening her bankruptcy case in February, 2000, to pursue her undue hardship discharge, the debtor had sought relief from her student loans through a disability discharge (SF 35). One of the lenders, USA Group, stipulated to a disability discharge of its student loans based upon papers submitted by the debtor and her psychiatrist (SF 36).

ECMC is the assignee of eight (8) loans distributed to the debtor (SF 38). The debtor has not attempted to negotiate any of the payment terms of these loans (SF 45). TERI is the guarantor of several student loans upon which the debtor had defaulted (SF 49–66). As between the two defendants, it is agreed that as of January, 2001, the debtor owes ECMC $69,309.56 (SF 40) and she owes TERI $88,708.41 (SF 69). The debtor has not made any payments on the subject student loans owed to either of the defendants (SF 70). According to the terms of the subject loans, TERI is also entitled to its reasonable attorneys fees and costs associated with the collections of its notes; those attorneys fees totaled $3,686.43 as of January 12, 2001 (SF 71, 72).

### 3. *Trial Testimony*

During the course of the two-day trial various witnesses were presented. The debtor's treating psychiatrist, Dr. Christine Barney, testified at great length and with competency, clarity and objectivity as to the debtor's past, present and reasonably anticipated future mental and emotional condition, and prognosis. She provided records to demonstrate that she has treated the debtor since November, 1993, that she has diagnosed the debtor with (1) complex mood disorder, (2) seasonal affect disorder ("SAD"), meaning that the debtor's condition is worse in the fall and winter, (3) major depressive episodes, and (4) bipolar mood disorder. Dr. Barney testified that during episodes of depression the debtor is unable to perform even basic self-care and does not eat or utilize proper hygiene when in that state. During such periods, the debtor sleeps excessively, her thoughts are scattered, she becomes socially isolated, and experiences recurrent thoughts of suicide. Dr. Barney explained that some of the debtor's depressive episodes are precipitated by a sense of loss or abandonment; sometimes an episode is weather induced. Dr. Barney based her diagnosis of the debtor upon the data she collected during the debtor's ongoing psychiatric treatments, the debtor's family history, and Dr. Barney's direct clinical observations of the debtor. She also pointed out that there is no definitive test that can confirm a brain disorder such as the type that she believes afflicts the debtor.

Furthermore, Dr. Barney testified that the debtor's condition is worsening and incurable. She stated that the debtor's depression is a biologic illness and that the debtor's ailment is neither voluntary, wilful nor contrived. Dr. Barney stated unequivocally at trial that the debtor will suffer from this serious depressive condition until death; that she has been symptomatic and depressed for over 20 years; that the disease is progressive and insidious; that it will render her unemployable for not less than two years; that it would take 3—5 years of optimal treatment to show any real improvement; and that the debtor would need ten years of uncontaminated employment success in order to sustain the level of pressure necessary to retain a typical $40,000 per year job. It was Dr. Barney's expert opinion that normal functionality in a work setting—for full-time or sustainable part-time work—is not possible for the debtor at this time. She also pointed out that the depression symptoms

are exacerbated when the debtor is under pressure. Dr. Barney confidently predicted that if the debtor were to return to work with an expectation that she could maintain herself and repay her student loans, that stress would cause the debtor's health condition to get worse, she would undoubtedly fail to succeed in her work and equally undoubtedly would find herself in severe depression as a result of that failure. Dr. Barney made clear that the debtor's health history demonstrates that financial pressure has consistently exacerbated the debtor's symptoms and illness in the past.

Dr. Barney also testified credibly that the debtor will never be free from recurring depression in a sustained fashion. She stated that once a patient has had three severe depressive episodes the risk is more than 90% that she will have another one. The debtor has had more than three depressive episodes. Hence, Dr. Barney predicts that the debtor will suffer severe depressive episodes in the future; and that stress, pressure, and recurring failure all make the condition worse and cause the severe depressive episodes to occur with greater frequency.

Dr. Barney was also asked whether there was a way to heal the debtor so that she could return to work successfully. Dr. Barney responded that if time and money were no object, then perhaps more frequent treatments or more intensive therapy or vocational training might help, but even under those circumstances she would give no guarantee that the debtor would be able to maintain full-time employment. However, money is, and will likely remain, a commodity in short supply for the debtor. Dr. Barney testified that even with optimal treatment, it would take 3 to 5 years for the debtor to achieve any real improvement. A history of frequent failure, according to Dr. Barney, despite reducing demands for each job, makes it more difficult for the debtor to succeed now. Dr. Barney also testified that there is a pattern of increasing severity regarding the debtor's condition. If the debtor somehow managed to obtain a $40,000 per year job and then lost it, a failure of that magnitude would, in Dr. Barney's opinion, place the debtor at serious risk of suicide. Dr. Barney testified that the student loans have been a source of stress for at least two years. In light of a pattern of adverse psychological events of increasing severity and the debtor's demonstrated inability to maintain employment, Dr. Barney concluded that the debtor is confronted with substantial psychological, emotional and personality obstacles to vocational success. Furthermore, the parties have stipulated that Dr. Barney opines that the debtor's condition is incurable, worsening with time such that there is no reason to believe that the debtor can return to work, and constitutes a condition that will persist until death (SF 3; see also SF 4–6).

Since 1993, the medications prescribed by Dr. Barney include Prozac and Effexor, which can assist with concentration as well as depressive and anxious symptoms. Although Effexor has caused Ms. Kelsey significant side effects, Dr. Barney stated that this remains an appropriate component of the debtor's overall treatment because of its significant benefits in mitigating depression. When the debtor has ceased taking Effexor from time to time, she suffered a return of symptoms.

While Dr. Barney testified that it was within the realm of possibility that the debtor was exaggerating her symptoms, she concluded that it was unlikely under the circumstances. Overall, Dr. Barney has impressive professional credentials in her field of psychiatric expertise, ample direct experience with the debtor and the credibility to provide persuasive evidence

in this proceeding. She testified in a competent, substantiated and straightforward manner. Her demeanor was professional and her responses appeared candid, well substantiated and sincere. For all of these reasons, the Court accords substantial weight to Dr. Barney's testimony.

In addition to the testimony of her medical expert, the debtor herself provided lengthy testimony regarding her psychological, employment, financial, and family history. Her testimony was candid and compelling in support of the requested discharge. The debtor testified that she enrolled in the VLS Master's program to improve her chances of gaining better employment in California and with the intention that upon graduation she would return to California and obtain a job at a particular firm which had an excellent environmental law department. However, the debtor admitted that she was concerned that her mental and emotional health might again interfere with her ability to complete a course of study.

It is stipulated that the debtor first consulted Dr. Barney in November, 1993 to obtain treatment which would allow her to function consistently and be at work or in class on time every day (SF 24). The debtor testified that Dr. Barney evaluated her and prescribed Prozac, a drug which the debtor had previously taken in San Diego, upon advice of a psychologist; and diagnosed her with severe depression among other mood disorders. The debtor explained that notwithstanding the medical care and prescribed medications, it took her two years to complete the VLS Master's program, a program designed to be completed in twelve months. She testified that although she graduated from the program with high honors, this was because many of the students in the program did not have law degrees and for many of her classmates English was not their first language and hence, in her opinion, the competition was not impressive.

The debtor explained that upon her arrival in Vermont, in 1993, she commenced work at the Conservation Law Foundation in Montpelier, Vermont where she continued working through the winter and spring of 1994. She undertook major projects and ultimately received credit from VLS for this internship. However, she "botched" a project and her work was criticized as being mediocre in quality and taking too long to complete. As a result, her supervisor would not sponsor the debtor for admission to the Vermont bar.

The debtor testified that in July, 1995 she took the New Hampshire bar exam because she had obtained a position in a New Hampshire law firm, VanDorn & Cullenberg, but learned in September, 1995 that she had not passed the bar exam. The law firm told her not to worry because she could take it again. Initially, she worked part-time at the VanDorn & Cullenberg firm because she was studying for the bar exam. The position paid $24,000 per year and she was paid on a salary basis. She testified that they expected her to work 50 hours per week. She found the work to be very demanding. She had cases involving sexual harassment and employment discrimination to handle on her own. The debtor testified that she made sufficient money to sustain herself, but had no extra money for payment of her various loans. She testified that loan payments on the subject student loans became due in October and December 1995. By December, 1995, she testified, she was feeling overwhelmed at the law firm, experiencing considerable stress and having difficulty balancing assignments. She noted that it was clear to her that she was going to be fired as tasks were increasingly being taken away from her. She felt that the same job pattern was happening at VanDorn &

Cullenberg as had happened at the Conservation Law Foundation. When she was terminated from her position at VanDorn & Cullenberg at the end of January, 1996, they advised her that she had not been performing adequately or finishing tasks in a timely fashion. The debtor testified that during the end of her tenure at VanDorn & Cullenberg, she maintained that she was not disabled even though she could no longer work full-time; she had concluded that if only she worked harder or was more congenial to the attorneys at the firm, then her actual or potential obstacles would disappear.

The debtor testified that after her termination from VanDorn & Cullenberg, she initially continued to study for the New Hampshire bar, but she determined that she could not mentally or emotionally handle the bar exam as a result of her depression, which was precipitated by both her job loss and the weather. Therefore, she did not retake the New Hampshire bar exam, and received unemployment benefits for six months. She testified that during this period of time she sent resumes to all attorneys in the Upper Valley telephone book. She was residing in Stafford, Vermont and sent resumes to all attorneys within a one-hour drive of her home. She testified that nothing came of her efforts, but she was certain that she sent them out, as such applications were required for continued unemployment benefits. She created the Public Interest Law Group, Ltd. in 1996. Her trial counsel incorporated this law group in both Indiana and Vermont, as First Line Legal Resources. The debtor testified that it was her idea to have law review students perform research and writing in order to fill the gap where an indigent person needs an answer as to whether a cause of action is feasible but does not have sufficient funds to afford to retain counsel.

In July, 1996, the debtor's unemployment benefits terminated. Ms. Kelsey testified that to make ends meet, she undertook barter arrangements, house sitting positions, set up a public interest law group for her to do freelance research and kept in touch with VLS career services. In June or July 1996, the debtor assisted in writing a grant and helped set up a seminar at VLS and moved to a care-taking position for summer, 1996. She then moved to another care-taking position in fall of 1996, involving a house and animals, which lasted until the end of 1996. The sole source of income that she had during 1997 was income from her limited legal research, at $15/hour, and the care-taking position. Ms. Kelsey testified that this income did not generate enough money to pay her student loans. The debtor testified that she continued to send out resumes during the fall, 1997, and to let the attorneys that she had worked with locally know that she was available to accept additional work. She decided to study for the Vermont bar exam, which she accomplished in July, 1997. She managed to obtain limited legal projects from local counsel during this period and was notified that she had passed the Vermont bar in the fall of 1997.

Between fall, 1997 and fall, 1998, the debtor undertook intermittent research projects for a client, Mr. Shelley Palmer. In late summer of 1998, she performed her last "lawyerly" task, and the last job for which she made money, when she drafted a long letter to Shelley Palmer's insurance company. The debtor testified that during November, 1998, she sent a letter to the defendants and other education loan creditors, through her legal counsel, seeking an informal discharge of the student loans. According to the debtor, she worked at manual labor, cleaning barn stalls from July 1999 to February, 2000, because it was the only way she had to earn money,

though she acknowledges she solicited legal work as late as 1999 by sending resumes for her new business, FirstLine Legal Resources.

During the summer of 2000, a Vermont Supreme Court brief was filed in the case where the debtor had written the initial memorandum for Shelley Palmer. She accepted the client's telephone calls and drafted the statement of facts for this legal brief during this summer. She testified that she wrote the statement of facts while her trial attorney herein, and then law associate, was out of state. During the course of drafting the statement of facts, she had great difficulty and hence sought and received an extension of time. The statement of facts was then due in early August, 2000. She testified that she never actually finished it and reportedly sent drafts to her appellate co-counsel, Attorney Paul Gillies, and he was dissatisfied with the drafts. Attorney Gillies then redrafted the facts and completed the brief "in a breakneck pace over the weekend" without the debtor's assistance. Attorney Gillies signed the brief because he had to get it filed the day he finished it.

The debtor testified that she had a breakdown when she saw what Attorney Gillies had done in a single weekend. She also lost Shelley Palmer as a client because he apparently was very angry that an extension had to be obtained, and made it clear that he believed the need for an extension was all her fault. She claims that the breakdown was a reaction to the fact that under pressure she cannot produce anything. Ms. Kelsey testified that she formerly had been able to produce legal documents that were acceptable and then she would feel good. However, in this instance, although she knew these facts clearly and had a good relationship with the client, she still could not put together a good brief. She testified that

this situation just confirmed what she had been trying to refute: that she would never be able to work as a lawyer. She testified that she had been very proud that she completed law school despite terrible obstacles, and was particularly pleased in light of the fact that neither of her parents finished college. She explained that she had never so deeply appreciated that "it was all gone" as she did that day. She has had suicidal episodes in the past but never as bad as the episode brought on by the failure to complete the brief.

She testified that she often felt manic level confidence in the summer, had unreasonable expectations of what she could do, and would forget how terrible she felt during winters. She testified that she went into a catatonic hibernation state lasting three weeks in August, 2000. In September 2000, one month after this breakdown, she signed two permanent and total disability certificates in an effort to extinguish her outstanding student loan obligations.

The debtor indicated that she finally figured out in the fall of 2000 that she could not "make it work." During this time, she had been entered on an attorney list making herself available to perform freelance legal work. She had reportedly sent out a letter applying for a part-time law clerk job with an entity referred to as LRC on August 17, 2000. Defendants argue that this is the time when she claims that she was in a catatonic state. On September 21, 2000 she also applied for a non law job with another company, Morristown. The debtor did perform limited legal work for LRC after she signed the total disability certificate. The debtor acknowledges that the application to LRC may have been inconsistent with the disability certificate. She testified that she was submitting resumes even at the same time she was applying for permanent total

disability because she was seeking only part-time work and only on behalf of First-Line, with the assumption that she could obtain the legal work and have her co-counsel (and trial counsel herein) perform the services. She reports she had already sold everything she had, including furniture, and felt desperate at the time, and therefore solicited work which she knew or should have known she could not perform.

According to Ms. Kelsey, every time she tried to work full time, she failed and it had serious health consequences. The debtor emphasized that the disability certificates that she submitted to the defendants in August 2000 provided for the possibility that she might be able to engage in substantial income-earning activity at sometime in the future.

Since August, 2000, the evidence reflects that the debtor has had one major depression episode, in early February, 2001. The debtor testified that the episode had to do with the work she had done as a freelance researcher. She reportedly had been offered a free lance position with a Minneapolis online research agency—which should have been subject to her successful completion of a project, but they hired her without her having ever submitted the project. She testified that she failed several of the tasks and was overwhelmed by assignments that she knew she should have been able to handle. She claims that this shortcoming was significant because it had seemed to her like a very manageable job. She claims that she could take or turn down assignments depending on how she felt, sleep and work when she wanted, did not need insurance and did not need a wardrobe. The debtor testified that she was devastated when she could not do this freelance research work, which she thought was really just glorified paralegal work. They fired her in early February, 2001 and that was what caused her major

breakdown that time. She testified that during this time she was also the sole "proprietor" of a business she started, Deja Vu Antiques, and had a rented space in a Barre, Vermont mall for approximately five months, which ended four or five months before trial and made virtually no money.

Pursuant to her trial testimony, the debtor acknowledged that certain disputed handwritten notes, identified as the defendants' joint trial exhibit number 6, are indeed her notes. She claims that these notes were created in June, 2000 to assist her trial counsel and to reflect her legal research regarding certain dischargeability issues related to her disability. The defendants argue that these notes pre-date June, 2000, were possibly created sometime in 1995, and represent a carefully constructed scheme to concoct circumstances calculated to lead to a discharge of her student loans on falsified grounds of undue hardship. Interestingly, the Court notes that there is no reference in these notes to the 1998 case of *In re Doherty,* 219 B.R. 665 (Bankr.W.D.N.Y.1998), which is relied upon extensively by the debtor in these proceedings, although her legal research notes do reference an unfavorable 1994 student loan discharge case. She testified that she wrote these notes in June/July 2000 on the screen porch of the house where she currently resides. In providing detailed support for her contention, the debtor testified at length regarding the circumstances surrounding the creation of the handwritten notes and the related discussions with her trial counsel, who was residing at the same house at the time. She also testified that these notes were to reflect her state of mind as of when she was at VanDorn & Cullenberg, and were intended only to assist her counsel. The notes state that she wanted to stay at VanDorn & Cullenberg for one year or at least through the summer (a

sunny time of year). She testified that even though these notes reflect that she was considering moving to California, it does not mean they were written in 1995. The debtor testified that she has always wanted to find a good job in California and relocate there, primarily because the weather there would diminish the symptoms of her weather related condition. Based upon the demeanor of the debtor while testifying as to the circumstances surrounding the creation and purpose of these handwritten notes, this Court rejects the contention that these notes demonstrate a scheme to fabricate the basis for the debtor's undue hardship claim [1].

In addition to the extensive testimony of the plaintiff and her treating psychiatrist, the Court also heard testimony from various legal practitioners regarding their professional interaction with the debtor and their perspectives on her legal skills. While the testimony of these attorney witnesses was often illuminating concerning the various shortcomings in the debtor's legal career, it was ultimately inconclusive and did not completely confirm or refute the competing contentions of the parties regarding the plaintiff's work capabilities. Overall, however, the testimony of the attorneys tended to confirm the Court's conclusion that the plaintiff suffers from significant debilitating conditions which impede her ability to perform the caliber of legal work that would be required for her to maintain a minimal life style and to pay her student loans.

It should be noted that in reaching its decision today, the Court has carefully considered and weighed the testimony of the defendants' psychological witness,

Mary E. Willmuth. The Court finds that Dr. Willmuth is certainly a qualified psychologist with impressive credentials, but that her testimony generally fails to refute the material testimony of Dr. Barney and is entitled to less weight. First, it should be noted that Dr. Willmuth is a licensed psychologist without the medical expertise of Dr. Barney, a licensed psychiatrist. As such, this Court finds that the testimony of Dr. Barney is more credible concerning existing and potential treatment of the debtor's psychological and emotional disabilities with available pharmacological therapies. More significantly, Dr. Willmuth based her evaluation of the plaintiff upon an interview of approximately two hours in length, as opposed to Dr. Barney's long term and in-depth observations and treatment of the debtor over a period of years. Most importantly, Dr. Willmuth's testimony was not inconsistent with Dr. Barney's essential conclusion, namely that the debtor suffers from a severe, long-term depressive disorder; and her testimony fails to refute a finding that requiring the debtor to pay her outstanding student loans under the circumstances would impose an undue hardship upon the debtor. Significantly, at the end of the day, Dr. Willmuth testified that indeed the plaintiff suffers from significant medical and emotional problems involving depression and mood disorder, that she will continue to suffer from this malady, that her depressive disorder is accompanied by a personality disorder that adversely effects her ability to work at optimum levels, and that she could not testify that the plaintiff is more likely than not to be able to main-

---

1. It should be noted that this Court did impose an evidentiary inference in favor of the defendants' position based upon a finding of spoliation of evidence by the plaintiff in this regard, but still concluded that the notes do not establish an intent to defraud. The Court's ruling concerning the evidentiary inference and related matters is discussed more fully in its Memorandum of Decision Granting Defendants' Motion for Sanctions entered in conjunction with this final judgment.

tain ongoing professional employment at a level sufficient to pay her outstanding loans. Moreover, while Dr. Willmuth testified that it was her opinion that the plaintiff is exaggerating her condition somewhat, either consciously or unconsciously, Dr. Willmuth testified that she was not convinced that the debtor is malingering.

## ISSUE

The issue presented is whether the competent and credible evidence shows that the Second Circuit *Brunner* test is satisfied, thereby entitling the debtor to a discharge of the subject student loans.

## DISCUSSION

The debtor seeks a final judgment discharging her student loan obligations owed to the defendants on the grounds that a preponderance of the evidence establishes that the debtor has met the test for establishing an undue hardship pursuant to § 523(a)(8) of the Bankruptcy Code and *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2nd Cir.1987). (hereafter "the *Brunner* test").

◼ A debtor seeking an undue hardship discharge under § 523(a)(8) has the burden of proof that the requirements for discharge are met. *See In re Doherty*, 219 B.R. 665 (Bankr.W.D.N.Y.1998). To obtain an "undue hardship" discharge of her student loan obligations, the debtor must establish each prong of the three-prong test set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2nd Cir.1987). *See In re Lehman*, 226 B.R. 805 (Bankr.D.Vt.1998). Under *Brunner*, a debtor must establish (1) that the debtor cannot maintain, based upon her current income and expenses, a "minimal" standard of living if forced to repay the student loans; (2) that additional circumstances exist indicating that this

state of affairs is likely to persist for a significant portion of the loan repayment period; and (3) that the debtor has made a good faith effort to repay the student loans. *Brunner*, 831 F.2d at 396. The three-prong *Brunner* test provides the definitive, exclusive authority that bankruptcy courts must utilize in this Circuit in deciding whether to grant a debtor an undue hardship discharge. *See In re Lehman, supra*. Moreover, Congress clearly intended to make a discharge of student loan obligations under § 523(a)(8) more difficult than that of other non-excepted debts. *Brunner*, 831 F.2d at 396; *see also In re Saburah*, 136 B.R. 246, 252 (Bankr.C.D.Cal.1992)(discussing legislative history and observing that "there is a strong public policy in favor of repaying student loans").

◼ This Court has reviewed the record in this instance in order to adhere to the congressional intent that student loan discharges should be more difficult than other non-excepted debts. Moreover, this Court closely scrutinizes claims for undue hardship based upon psychological or emotional disability due to the susceptibility of such claims to fabrication, exaggeration and fraud. Well qualified and substantiated expert testimony is essential. The demeanor and credibility of witnesses in testifying regarding the pertinent facts are also paramount considerations in resolving the plethora of factual disputes encountered in student loan discharge cases involving claims of psychological or emotional illness.

◼ In this instance, the parties have stipulated that the debtor has satisfied the first prong of the *Brunner* test, thereby eliminating the need for the presentation of evidence on this point. *See* Joint Pretrial Statement filed April 16, 2001, at para. 3(e) [Dkt.# 189–1]. Regarding the

second and third prong, the debtor has established by a preponderance of the evidence her entitlement to relief under § 523(a)(8) and the *Brunner* test. The debtor has shown both that she suffers from a serious and ongoing emotional and psychiatric disability which will make it unlikely that she will be able to repay the student loans at any point in the foreseeable future without undue hardship and that she has made good faith attempts to pay her student loans.

Although the defendants have unequivocally challenged the underpinnings and scope of Dr. Barney's medical opinion and have raised issues regarding the validity and integrity of the debtor's claim of disability, the preponderance of the credible and competent expert testimony favors the debtor on both points. The debtor's depression and related emotional and psychological disorders are severe, debilitating, life threatening, longstanding and have continued to defy successful treatment over time. Moreover, it is clear that the debtor's condition is exacerbated by her attempts to obtain and maintain gainful employment in her professional field as warranted by her advanced education, and at a level necessary to maintain a minimal standard of living while paying her outstanding student loans. Based upon the testimony of the debtor and her psychiatrist, it is more likely than not that the debtor's debilitating condition will persist for a significant portion of the repayment period. Under the circumstances, the Court finds a credible risk of serious injury, including relapse and suicide, if the debtor is unable to discharge these debts and thus remains subject to future collection activity and compelled to seek and retain employment sufficient to repay these substantial debts. A debtor's "fresh start" is fatally undermined if it comes at such a perilous price.

The Court must address the defendants' suggestion that the debtor is malingering. Dr. Barney has persuaded the Court regarding the debtor's good faith in experiencing and presenting symptoms of her disability claim to Dr. Barney and others, and her role in the development of Dr. Barney's disability opinion. Furthermore, the debtor and her witnesses have persuaded the Court that her prior, current and reasonably anticipated future minimal standard of living are not machinations, self-serving or self-imposed for personal gain, but rather are credibly presented and documented, and her disability is involuntary and severe, thereby warranting the requested relief. *See In re Lehman,* 226 B.R. at 808; *In re Saburah,* 136 B.R. 246, 252 (Bankr.C.D.Cal.1992); *In re Erickson,* 52 B.R. 154 (Bankr.N.D.1985).

Regarding the third prong of *Brunner,* the debtor has also presented a credible explanation for her failure to tender payments on these remaining student loan obligations. The Court is persuaded by the debtor's testimony that she experienced confusion as to the true holder of her student loan obligations based upon the successive transfer or assignment of her various student loans, and her payments on other prior undergraduate student loan obligations. Her lack of any payment on the defendants' outstanding loans is attributable more to a good faith misunderstanding concerning the ultimate beneficiary of her prior loan payments combined with a continuing desperate financial situation, rather than any intentional financial ignorance or deliberate withholding of payment. It also appears from the evidence that the subject loans became due just prior to the debtor's termination at VanDorn & Cullenberg and her subsequent breakdown. Once again, her demeanor while testifying on this important issue of her good faith is a compel-

ling consideration in the Court's finding in this regard.[2]

In reaching its conclusion, this Court is determining and weighing the credibility and sufficiency not only of the evidence presented by the debtor in support of her undue hardship claim, but also the defendants' arguments and evidence regarding their defenses to the debtor's claim for a discharge of her student loan obligations. In so doing, while a close question, this Court nonetheless concludes that the debtor has met her burden of proof on the merits of her claim and each prong of the *Brunner* test. Moreover, the defendants have fallen short in establishing their defenses to the undue hardship claim involving the challenged nature and extent of the debtor's disability, her earning capability, her credibility and her good faith efforts to repay these loans. As indicated above, the parties have stipulated that the debtor cannot maintain, based upon her current income and expenses, a "minimal" standard of living if forced to repay her remaining student loans. By the greater weight of the credible evidence adduced by stipulation and at trial, this Court finds that it is more likely than not that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the loan repayment period and that the debtor has made a good faith effort to repay the student loans.

Based upon all the competent and credible evidence the debtor has shown by a preponderance of the evidence that she has satisfied the three elements of the *Brunner* test and refuted the defendants' defenses thereto under § 523(a)(8). Therefore this Court grants final judgment in favor of the debtor, and deems the debtor's subject student loans held by these defendants dischargeable under the particular circumstances of this case. Based on the foregoing, the counterclaim raised by TERI is denied.

2. For cases discussing a financially distressed debtor's entitlement to a discharge of student loans despite failure to initiate payments, see *In re Clevenger,* 212 B.R. 139 (Bankr.W.D.Mo. 1997); *In re Derby,* 199 B.R. 328 (Bankr. W.D.Pa.1996); *In re Hawkins,* 187 B.R. 294 (Bankr.N.D.Iowa 1995); *In re Reilly,* 118 B.R. 38 (Bankr.D.Md.1990); *In re Birden,* 17 B.R. 891 (Bankr.E.D.Pa.1982); *see also In re Sands,* 166 B.R. 299 (Bankr.W.D.Mich.1994); *cf. In re Boyd,* 254 B.R. 399 (Bankr.N.D.Ohio 2000); *In re Lehman,* 226 B.R. at 808–809; *In re LaFlamme,* 188 B.R. 867 (Bankr.D.N.H. 1995); *In re Garrett,* 180 B.R. 358 (Bankr. D.N.H.1995).